467 A.2d 288

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Michael J. TRAVAGLIA, Appellant.**

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**John Charles LESKO, Appellant.**

Supreme Court of Pennsylvania.

Argued March 10, 1983.

Decided Sept. 29, 1983.

Reargument Denied Dec. 14, 1983.

476

480

Rabe F. Marsh, III, Greensburg (Court-appointed), Welsh S. White, Pittsburgh, for appellant at No. 26.

Dante G. Bertani, Public Defender, Timothy J. McCormick, Asst. Public Defender, Greensburg, for appellant at No. 37.

John J. Driscoll, Dist. Atty., Timothy J. Geary, Asst. Dist. Atty., Greensburg, for appellee at No. 37.

Marion MacIntyre, Deputy Atty. Gen., Harrisburg, for appellee at No. 26.

Before ROBERTS, C.J., and NIX, LARSEN, FLAHERTY, McDERMOTT, HUTCHINSON and ZAPPALA, JJ.

## OPINION

ZAPPALA, Justice.

We are called upon to review convictions of first degree murder, for which the Appellants were sentenced to death.

Pursuant to 42 Pa.C.S. § 9711(h), we examine the record for errors at trial, and to determine whether the sentence of death should be affirmed or vacated.

## I. BACKGROUND

In the early morning hours of January 3, 1980, Apollo Police Officer Leonard Miller was killed by two bullets from a .38 caliber hand gun, after having stopped a silver-colored Lancia sports car, containing three men, which had several times sped past his position at the Apollo Stop-and-Go convenience store. Officer Miller was found lying on the highway by police officers who were responding to his radio request for assistance. His service revolver had been drawn, and all six rounds had been fired. Police investigation turned up the Lancia, abandoned, with the windows shattered and bullet holes in it. It was established that the automobile was registered to one William Nicholls of Pittsburgh who had recently disappeared.

Prior to the Miller homicide, state police had received evidence indicating that Appellant Travaglia may have been involved in a number of armed robberies and killings which had taken place in Pittsburgh and surrounding counties. Pursuant to their investigation, the state police had found a vehicle, owned by a homicide victim, abandoned near a motel where Travaglia and a man named Daniel Keith Montgomery had been staying.

Pittsburgh police located Montgomery in the early evening hours of January 3, 1980 in the downtown area of Pittsburgh. While questioning him, they discovered a .38 caliber revolver on his person. Montgomery told the police that Travaglia had given him the weapon and that he (Travaglia) and Appellant Lesko had at that time talked about "wasting a policeman." Montgomery then told police that both Appellants Lesko and Travaglia were staying in a room at the Edison Hotel in downtown Pittsburgh. The police proceeded immediately to the Edison where they arrested Lesko and Travaglia. Appellants were taken to the Public Safety Building and, after being given the standard

*Miranda* warnings, were individually interrogated. Both gave statements implicating themselves in the killing of Officer Miller, and in the killings of William Nicholls, Peter Levato, and Marlene Sue Newcomer.

Following various delays caused by two changes of venue and a mistrial, trial commenced in Westmoreland County on January 21, 1981, before Westmoreland County Common Pleas Court Judge Gilfert Mihalich and a jury selected in Berks County. The jury found the Appellants guilty of the first degree murder of Officer Miller on January 30, 1981. On February 3, 1981, the jury, finding aggravating circumstances which outweighed any mitigating circumstances, imposed the penalty of death upon Appellants.

## II. TRIAL ERRORS ALLEGED
### A. SUPPRESSION MATTERS

Appellants claim that they were unlawfully arrested and that certain evidence should be suppressed as the fruit of the unlawful arrest. The evidence consists of a .22 caliber revolver taken from Lesko and a confession given by each of the Appellants.

Prior to the arrest, the police knew the following:

Three homicides by shooting had occurred in Westmoreland County between December 29, 1979 and January 3, 1980. The December 29 shooting of Peter Levato and the January 1 or 2 shooting of Marlene Sue Newcomer were done with a .22 caliber revolver. The January 3 shooting of Leonard Miller was done with a .38 caliber revolver.

During the approximate period of the killings, there had been a series of robberies of convenience stores in Westmoreland and Indiana Counties at which the victims were bound with yellow electrical wire. Travaglia's father, Bernard Travaglia, had told the police that a spool of yellow electrical wire and a .38 caliber revolver had been stolen from him and that he suspected Travaglia of stealing the revolver. An inspection of a truck owned by Travaglia and repossessed by a bank had revealed yellow electrical wire similar to that stolen from Travaglia's

father and that used in the robberies. Bernard Travaglia had also told the police that his son owned a .22 caliber revolver but had told him it was confiscated by a game warden. The Pennsylvania Game Commission had contradicted the report of the confiscation.

The victims of one of the robberies had said that the perpetrators fled in a tan Dodge Ram Charger with window curtains. The body of Marlene Sue Newcomer had been discovered in such a vehicle.

On January 3, 1980, an arrest warrant was issued for Travaglia for receiving stolen property in connection with a burglary at Sonny's Lounge on Route 22 in Delmont, Westmoreland County. Travaglia was known to have been staying at the time with another individual at the Thatcher Motel, which was next to Sonny's Lounge. Peter Levato's car had been found abandoned on December 29, 1979, within a mile of the motel.

The police also knew that the windows of the escape vehicle used by the perpetrators of the Miller homicide had been shot out and that three men had been seen in the area hitchhiking toward Pittsburgh. A motorist, James Henderson, who gave a ride to a group of three men, had been previously acquainted with Travaglia and had identified him as one of the riders.

The police learned that Room 616 of the Edison Hotel in Pittsburgh had been rented to a Michael Simons and a Mr. Lesko. Travaglia was known to have used the alias Michael Simons. Information obtained from Daniel Keith Montgomery confirmed that Lesko and Travaglia were in Room 616 of the Edison Hotel and indicated that Lesko still had a .22 caliber revolver. A night clerk at the hotel told police that the Appellants were still in the room. At 10:20 p.m. on January 3, the clerk unlocked the room with a pass key. The police entered without announcing their identity or purpose. Lesko pointed his gun at them before surrendering.

Travaglia claims that his arrest was unlawful because the warrant for his arrest on the charge of receiving

stolen goods was issued without sufficient probable cause. We need not decide that question because we find that the validity of the arrest does not depend on the validity of the warrant. A police officer may arrest without a warrant where there is probable cause to believe that a felony has been committed and that the arrestee is the felon. Probable cause exists where the facts and circumstances within the knowledge of the officer are reasonably trustworthy and sufficient to warrant a person of reasonable caution in believing that the arrestee has committed the offense, *Commonwealth v. Jackson,* 450 Pa. 113, 299 A.2d 213 (1973). The officers' investigation and the information they acquired, as detailed above, gave them probable cause to believe that the Appellants were the perpetrators of the homicides. This allowed them to arrest the Appellants without a warrant.

The Appellants also claim that the arrests were invalid because the police acted improperly in entering the hotel room without a warrant and without announcing beforehand their identity and purpose. They base their claim on the rule prohibiting a warrantless entry into a suspect's dwelling without exigent circumstances, *Commonwealth v. Williams,* 483 Pa. 293, 396 A.2d 1177 (1978); *Payton v. New York,* 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980), and on the "knock and announce" rule, *Commonwealth v. Norris,* 498 Pa. 308, 446 A.2d 246 (1982); *Commonwealth v. Newman,* 429 Pa. 441, 240 A.2d 795 (1968). The Appellants would treat the hotel room as a dwelling and apply the requirements of *Williams* and *Payton* to both the warrantless entry and the failure of the officers to announce their identities and purpose. *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964) supports the Appellants' contention that they had a reasonable expectation of privacy in their hotel room. The Court in *Stoner* held that a hotel clerk does not have authority to allow police to search a guest's room. However, we find that even if the requirements of *Williams* and *Payton* apply to hotel rooms, they do not render these arrests invalid. In *Williams,* we listed certain factors that would tend to support a finding that a warrantless arrest of

a suspect in his or her home is legal. These include, *inter alia,* that a grave offense is involved, particularly a crime of violence; that the suspect is reasonably believed to be armed; a clear showing of probable cause—including reasonable, trustworthy information—to believe that the suspect committed the crime; and strong reason to believe that the suspect is on the premises. We find that these factors were present in this case and were sufficient to establish exigent circumstances so as to justify a warrantless entry and arrest. Although the exigent circumstances which "justify failure to obtain an arrest warrant are not entirely coextensive with those exigencies which justify noncompliance with the 'knock and announce' rule," *Commonwealth v. Norris,* 498 Pa. at 313 n. 2, 446 A.2d at 248 n. 2, the facts previously recited clearly demonstrate the existence of circumstances which excused compliance with this Fourth Amendment protection as well. *See, Miller v. United States,* 357 U.S. 301, 309, 78 S.Ct. 1190, 1195, 2 L.Ed.2d 1332 (1957); *Sabbath v. United States,* 391 U.S. 585, 591, 88 S.Ct. 1755, 1759, 20 L.Ed.2d 828 (1967).

Lesko challenges his confession on the basis he was not told he was a murder suspect when given his *Miranda* warnings. He bases his claim on an allegation that on the pre-interrogation warning form which he signed, the only charges indicated were a firearms violation and resisting arrest. He argues that because homicide charges were not also included on the form, he did not possess sufficient knowledge to understand the consequences of waiving his rights and that therefore his waiver was invalid.

*Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) does not require that in addition to the various rights enumerated a suspect must be provided information as to the crime under investigation. This Court has held, however, that a suspect must have "an awareness of the general nature of the transaction giving rise to the investigation," in order to make an intelligent and understanding waiver of his rights. *Commonwealth v. Dixon,* 475 Pa. 17, 22, 379 A.2d 553, 556 (1977). *See also Commonwealth v.*

*Richman,* 458 Pa. 167, 320 A.2d 351 (1974). It was stated in *Dixon* that where "the defendant has not been furnished with such information [so as to make him aware of the transaction involved] and a pre-trial challenge concerning the validity of a confession is made on this ground, the Commonwealth must prove by a preponderance of the evidence that the defendant knew of the occasion for the interrogation." 475 Pa. at 23, 379 A.2d at 556. In that case it was held that the Commonwealth had not met its burden. We found that there existed a palpable ambiguity as to the defendant's understanding of the reason for her interrogation before she executed the waiver of her rights. This ambiguity arose out of the fact that the defendant had defaulted in making restitution payments ordered by a justice of the peace several months earlier, a default which she had been warned would result in her arrest. Because the Commonwealth had not refuted the reasonable inference that the defendant, when she waived her rights, thought that the interrogation was to be in regard to the default, the waiver could not be said to be an intelligent and understanding one as to questioning about a homicide, and statements elicited as to the latter were suppressed.

■ Appellant Lesko argues for the same result here. We find the facts to be sufficiently different, however, that applying the same rule a different result is required. From the record of the Suppression Hearing it is unclear whether Lesko was specifically told that the questioning would cover several murders before he was given the waiver form to sign. At one point Detective Frank Amity testified: "First thing we did was read him his pre-interrogation warning form advising him of his rights, the charges against him, *what we wanted to talk to him about.*" (Suppression Hearing, p. 553, Sept. 23, 1980) (Emphasis added). Detective Amity later testified regarding what occurred *after* Lesko signed the form as follows:

Q. After you filled out this pre-interrogation warning form, what did you do?

A. Well, we advised him of the charges that we arrested him for.

Q. What were those?

A. Violation of the Uniform Firearms Act and the recklessly endangering another person. And we also told him that he was a suspect in several murders that happened and wanted to talk to him about those.

Q. After you told him this, what was the next thing that happened?

A. He was more willing to tell us about everything that he did.

(Suppression Hearing, p. 558, Sept. 23, 1980).

Even if we assume that prior to being given the waiver form Lesko was not told in words that the interrogation would include questioning as to the homicides, we cannot conclude that the listing of only the two minor charges on the form created an ambiguity in Lesko's mind as to the purpose of the interrogation. It must be recalled that the four homicides about which Lesko was questioned had occurred over the five days immediately preceding the interrogation. The most recent homicide, the case at bar, had occurred in the early morning hours the same day. Indeed, Appellants Lesko and Travaglia had handed the weapon with which Officer Miller had been shot to Daniel Montgomery less than an hour before their arrest. To find under the circumstances here present that Lesko was unaware of the general nature of the transaction giving rise to his questioning would be tantamount to treating as fact that which is patently hypothesis and fantasy. We need not expound upon the differences which distinguish these facts from those in *Dixon*. We think it sufficient to note that in *Dixon* we recognized that "the fact that interrogation follows hard upon the criminal episode and there is no circumstance lending ambiguity to the direction and purpose of the questioning," 475 Pa. at 23, 379 A.2d at 556, could supply the necessary evidence that the defendant knew of the occasion for the interrogation. Viewing the entire episode in context, we must agree with the conclusion of the trial judge

that Lesko "was, in fact, advised of the seriousness of his situation and was aware that the police were not concerned with the relatively minor charges." (Opinion, p. 44).

The Appellants claim that it was improper to admit testimony by James Henderson identifying them as two of three men he picked up and gave a ride to on January 3, 1980. The basis of this challenge is that Henderson had previously identified them from a photographic array. At the time of this photographic identification, the Appellants were in custody. The identification was conducted without the Appellants being represented by counsel.

In *Commonwealth v. Whiting,* 439 Pa. 205, 266 A.2d 738 (1970), we held that a suspect in custody was entitled to have counsel present at a photographic identification, and that the absence of counsel would bar a subsequent in-court identification unless there was a showing that such identification had an independent origin. The Commonwealth contends that *Whiting* does not survive *United States v. Ash,* 413 U.S. 300, 93 S.Ct. 2568, 37 L.Ed.2d 619 (1973). It has previously been suggested that *Whiting* was "undercut considerably" by *Ash, Commonwealth v. Diggs,* 260 Pa.Super. 349, 355 n. 5, 394 A.2d 586, 589 n. 5 (1978). It has also been suggested that to the extent *Whiting* expressed an interpretation of *federal* constitutional law, it did not survive *Ash,* although the *state* constitution, Article I, Section 9, might be given a broader sweep and require such a rule. *Commonwealth v. Ray,* 455 Pa. 43, 315 A.2d 634 (1974) (plurality opinion, Pomeroy, J.). Since the *Ash* decision, this Court has several times found it unnecessary to reach the issue whether the Pennsylvania Constitution requires that an accused be represented by counsel at a post-arrest photographic identification. *See, Commonwealth v. Holland,* 480 Pa. 202, 389 A.2d 1026 (1978); *Commonwealth v. Scott,* 469 Pa. 258, 365 A.2d 140 (1976). We need not reach that issue in this case either. Assuming *arguendo* that the Appellants were entitled to, but did not have counsel present at the photo array, and therefore that the identification was improper, it does not necessarily follow that the identification must be sup-

pressed. The law is clear that even when an improper pre-trial identification is made, an in-court identification is nevertheless admissible if it has sufficient, independent basis. *Commonwealth v. Connolly,* 478 Pa. 117, 385 A.2d 1342 (1978). Here, Henderson was with the Appellants for thirty to forty-five minutes and was previously acquainted with Travaglia. This provided a sufficient, independent basis for the in-court identification.

■ Appellants next argue that their confessions were inadmissible because they were arraigned beyond the six-hour time limit set in *Commonwealth v. Davenport,* 471 Pa. 278, 370 A.2d 301 (1977). Appellants were arrested at 10:20 p.m. in the City of Pittsburgh. They were immediately informed of the charges against them and given the standard *Miranda* warnings of their rights. Once again after arrival at the police station, the Appellants were advised of the possible charges against them, told their rights, and both executed written waivers of their rights to remain silent and to have counsel present at further questioning. Lesko's interview began within twenty minutes of his arrest and continued, with short breaks for coffee, for approximately an hour and a half. Travaglia likewise was interviewed for about an hour and a half after being detained for forty minutes in a holding cell. It is to be noted that the interviews involved discussion of at least four separate homicides, in addition to various other crimes charged, which had occurred over a period of seven days in three different counties. It is not surprising, then, that these initial interrogations spanned a relatively long period of time, Lesko's concluding at 12:20 a.m. and Travaglia's at 12:47 a.m.

After a pause of about ten or fifteen minutes, each Appellant then reiterated on tape the substance of the initial interviews as to each homicide discussed. With each of these taped statements requiring fifteen to twenty minutes, and with short breaks for food and rest, it was approximately 3:10 a.m. when the interrogations were complete. The Appellants were arraigned in front of Allegheny County District Justice Martin McTiernan at 3:50 a.m., Lesko on

charges of homicide and conspiracy, and Travaglia on the same charges along with an additional count of receiving stolen property. This was five and one-half hours after their arrest. Following this arraignment, around 4:15 a.m., the Appellants were returned to the Public Safety Building. They remained there until 4:35 a.m. when they were turned over to state police officers. They were arraigned in front of Westmoreland County District Justice Michael Moschetti at 5:55 a.m. in the County Courthouse in Greensburg, seven and one-half hours after their arrest.

In *Davenport,* this Court adopted "a rule under which the admissibility of any statement taken while the accused is in custody before preliminary arraignment is based on the length of the delay between arrest and arraignment." 471 Pa. at 286, 370 A.2d at 306. Although stated as mandatory and without any explicit exceptions, the rule that "[i]f the accused is not arraigned within six hours of arrest, any statement obtained after arrest but before arraignment *shall* not be admissible at trial," *Id.* (emphasis added), admits of an implicit exception "[S]ix hours provides a workable rule which can be readily complied with *in the absence of exigent circumstances." Id.,* n. 7 (emphasis added)). Although the continuing vitality of the *Davenport* rule as a whole is subject to speculation after *Commonwealth v. Blady,* 492 Pa. 285, 424 A.2d 864 (1981) (Larsen, J., dissenting, joined by Flaherty, J.), and *Commonwealth v. Bennett,* 498 Pa. 656, 450 A.2d 970, 971–972 (1982) (Flaherty, J. concurring, joined by Hutchinson, J.) [*see also, Commonwealth v. Jenkins,* 500 Pa. 144, 151, 454 A.2d 1004, 1008 (1982) (Concurring Opinion of McDermott, J.) ], it is clear that a majority of this Court has recognized the implicit "exigent circumstances qualification." *Commonwealth v. Keasley,* 501 Pa. 461, 462 A.2d 216 (1983); *Commonwealth v. Jenkins,* 500 Pa. at 150, 454 A.2d at 1007 (1982).

After unraveling a tangled web of criminal activity, the Pittsburgh police were able to arraign the Appellants on homicide charges in Allegheny County within the six hours allowed by *Davenport.* We may take judicial notice of the

approximately 40-mile distance between Pittsburgh and Greensburg, where the Appellants were arraigned on the homicide charges in the case at bar. If we are to require that arraignment take place in the county in which jurisdiction for the crimes charged lies, it would be the height of folly to ignore the temporal and spatial realities which attend circumstances such as these, where arrest and arraignment occur a substantial distance apart. *Cf. Commonwealth v. Dreuitt*, 457 Pa. 345, 321 A.2d 614 (1974) (time necessary to transport defendant from place of arrest [Baltimore, MD] to Philadelphia not considered as part of unnecessary delay between arrest and arraignment, where defendant was advised of right to counsel and of charges against him at place of arrest) (O'Brien, J., announcing Opinion of the Court, joined by Eagen and Pomeroy, JJ.). We observe that except for the identity of the victims in the crimes charged, the Westmoreland County arraignment provided the Appellants with no more information than the Allegheny County arraignment had two hours previously. Under these circumstances, we find no error in the admission of the statements.

## B. TESTIMONY AT TRIAL

Appellants allege that it was error for the trial court to allow a prosecution witness, Ricky Rutherford, to testify as to criminal acts of the Appellants, occurring just prior to the Miller homicide, which were not included in the crimes charged at bar.

Rutherford's testimony consisted of an account of how he had accompanied Lesko and Travaglia from the Edison Hotel in downtown Pittsburgh, where the Appellants had abducted one William Nicholls in his automobile; how Travaglia had shot Nicholls in the arm and then forced him to drive them out of town; how both Appellants had abused Nicholls along the way; how they had driven to a lake and, after Rutherford helped them find a large rock, how Appellants had taken Nicholls down to the lake and returned to the car without him. Rutherford testified that the trio then

went to Travaglia's father's house where they stole a .38 caliber pistol, and returned to the house and forced Rutherford to enter the garage to get other ammunition after they found the gun contained the wrong type. Rutherford then testified to their speeding past Officer Miller several times, and to the subsequent shooting of Miller by Travaglia.

The law is clear in Pennsylvania that evidence of other unrelated criminal conduct of an accused is generally inadmissible to prove his commission of the crime for which he is being tried. *Commonwealth v. Styles,* 494 Pa. 524, 431 A.2d 978 (1981); *Commonwealth v. Brown,* 489 Pa. 285, 414 A.2d 70 (1980); *Commonwealth v. Peterson,* 453 Pa. 187, 307 A.2d 264 (1973).

It is equally clear, however, that evidence of other crimes is admissible where it is relevant to prove (1) motive, (2) intent, (3) a common scheme or plan involving the commission of two or more crimes so closely related that proof of one tends to prove the other, (4) the identity of the accused as the perpetrator, or (5) the absence of mistake or accident. *Styles,* 494 Pa. at 525–26, 431 A.2d at 980.

These exceptions are not to be applied in a vacuum, however. "Evidence of other offenses is subject, as is all relevant evidence, to exclusion if its probative value is outweighed by the 'danger that the facts offered may unduly arouse the jury's emotions of prejudice, hostility or sympathy.'" *Commonwealth v. Terry,* 462 Pa. 595, 603, 342 A.2d 92, 96 (1975) (dissenting opinion of Roberts, J.); *Commonwealth v. Brown,* 462 Pa. 578, 594, 342 A.2d 84, 92 (concurring opinion of Roberts, J., joined by Manderino, J.). *See also,* Fed.R.Evid. 403, 404(b); McCORMICK'S HANDBOOK OF THE LAW OF EVIDENCE § 185, at 438–39 (2d ed. E. Cleary 1972).

Our review of the record leads us to the conclusion that while the possibility of prejudice existed, it was heavily outweighed by the probative value of Rutherford's testimony. The Appellants were advancing the theory that the shooting of Officer Miller was an accident, that Travaglia's

finger had slipped from the gun's hammer. Viewing the facts of the Miller incident in isolation, this theory would be hard to refute.

The Commonwealth introduced Rutherford's testimony to show motive and intent. The details of the incidents which occurred just a short time prior to Officer Miller's shooting were developed to show that the Appellants were not just out to harass Miller that evening, but rather that they were in a stolen car, with the victim Nicholls' personal belongings and two firearms which could connect them to the prior wrongdoing.

Taken in this context, the facts elicited from Rutherford are so heavily related to and intertwined with the circumstances of Miller's killing that their evidentiary value greatly outweighs any possible prejudice suffered by the Appellants. Therefore, the trial court correctly allowed this testimony to be admitted.

■■■■■ Part of the arguments on this point merit a brief, separate discussion. According to this line of argument, the details of the Nicholls episode as testified to by Rutherford were so horrid as to inflame the passions of the jury and prejudice them against the Appellants *during the sentencing phase* of the trial and therefore were improperly admitted. Whether the trial court in a capital case, in balancing the probative value of proffered evidence against its potentially prejudicial effect, must give separate consideration to the possible effect of the evidence at the sentencing phase, is a question which admits of no general answer. There may be circumstances where evidence, deemed admissible at trial because its relevance to the determination of guilt outweighs its possible prejudice, should nevertheless be excluded because it is so inflammatory that its relevance to determination of sentence would be outweighed by its potential prejudice. *Cf. Commonwealth v. Zettlemoyer,* 500 Pa. 16, 53 n. 21, 454 A.2d 937, 956 n. 21 (1982) (conceivable that the reading of a "loaded" indictment to establish felony element of the aggravating circumstance that "the victim was a prosecution witness to a murder or other felony committed

by the defendant ...," 42 Pa.C.S. § 9711[d][5], could so inflame the jury that the possibility of prejudice would outweigh the evidentiary value of reading the indictment.). In most cases, however, the decision that the evidence is admissible for purposes of the guilt phase renders it, like all evidence admitted at trial, admissible for the penalty phase as part of the "circumstances" to be considered by the jury. As long as there is no "embellishment" upon the facts or improper attempt by the prosecutor to dwell upon the inflammatory character of the evidence, no additional weight should be accorded to the potential for prejudice because such evidence might play a part in the sentencing determination. Where facts are relevant for a proper purpose at trial, defendants may not be heard to complain about the horrid character of such facts. To find otherwise would give rise to the perverse result that a capital defendant would benefit more, the more horrible the background circumstances were.

In the present case we find that Rutherford's testimony went uncontradicted. We also find that the prosecutor made minimal reference to this testimony in his closing at the guilt phase, and then only to the substance of the testimony, not to the details. Furthermore, he made no reference at all to Rutherford's testimony or the details of the Nicholls episode in his argument at the penalty phase. Indeed, any reference to Nicholls during the penalty phase was made by counsel for Appellant Travaglia. Upon thorough review of the record we find that the prejudicial effect of Rutherford's testimony was outweighed by its probative value in determining guilt, and was not exacerbated by its treatment in determining the sentence to be imposed.

Appellants also contend that they were prejudiced by Rutherford's testimony that their actions as to Nicholls seemed to him "like something they did all the time." In view of the record and the trial court's immediate cautionary instructions, the error, if any, was harmless beyond a reasonable doubt. *Commonwealth v. Story*, 476 Pa. 391, 383 A.2d 155 (1978).

## C. SENTENCING HEARING

The Appellants raise several allegations of error during the sentencing phase of their trial which, they argue, require suspension of the death penalties and imposition of life sentences.

The first of these allegations is that it was error for the court to allow into evidence as an aggravating circumstance the Appellants' guilty pleas to homicide charges in Indiana County arising out of the Nicholls incident. The statute provides that

> evidence may be presented as to any matter that the court deems relevant and admissible on the question of the sentence to be imposed and shall include matters relating to any of the aggravating or mitigating circumstances specified in subsections (d) and (e). Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d).

42 Pa.C.S. § 9711(a)(2). One of the aggravating circumstances which may be considered is that

> [t]he defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

42 Pa.C.S. § 9711(d)(10). The Appellants argue that because sentence had not been imposed by the Indiana County Court, the guilty pleas were not final "convictions" for purposes of the statute, and therefore should not have been considered as an aggravating circumstance. Appellants cite *Commonwealth v. Zapata,* 455 Pa. 205, 314 A.2d 299 (1974), as holding counsel ineffective for bringing up prior "convictions" where sentence had not been imposed, because such convictions were not grounds for impeachment as they were not final. They also cite *Commonwealth v. Myers,* 485 Pa. 519, 403 A.2d 85 (1979). There we granted Appellants a new trial where the prosecutor had manipulated the court calendar to delay sentencing of a person found guilty of perjury, in

order to prevent that person's being ruled incompetent to testify under the Disqualification Act, 19 P.S. § 62. And the Appellants cite generally *Commonwealth ex. rel. McClenachan v. Reading,* 336 Pa. 165, 6 A.2d 776 (1939), wherein it was stated that

> [i]n interpreting a statute using the word 'conviction' the court has held that the strict legal meaning must be applied except where the intention of the legislature is obviously to the contrary.

336 Pa. at 169, 6 A.2d at 778. This "strict legal meaning", requires a verdict accompanied by sentence, and is to be contrasted with statutes wherein the legislature uses the language "found guilty" to permit use of a verdict unaccompanied by a sentencing. *See, e.g., Rosenthall v. State Board of Pharmacy,* 3 Pa.Cmwlth. 621, 284 A.2d 846 (1971).

While this argument has superficial appeal, it must fail upon closer inspection. The clear import of the first part of subsection (d)(10) is to classify the commission of multiple serious crimes as one of the bases upon which a jury might rest a decision that the crime of which the defendant stands convicted, and for which they are imposing sentence, merits the extreme penalty of death. The purpose of the second part of subsection (d)(10) just as clearly is to classify the fact that the defendant was already serving a life sentence at the time he committed the offense at issue as another basis for such a decision. The first part of the subsection allows as an aggravating circumstance the fact that "the defendant has been convicted of another Federal or State offense, committed either before *or at the time of the offense at issue,* for which a sentence of life imprisonment or death was imposable . . ." 42 Pa.C.S. § 9711(d)(10) (Emphasis added). The emphasized portion of the statute highlights the incongruity of the construction urged by the Appellants. By including offenses committed contemporaneously with the offense in issue, the legislature clearly indicated its intention that the term "convicted" not require final imposition of sentence, but cover determinations of guilt as well. Given the practical operation of the criminal

justice system, a contemporaneous offense would either be tried together with the "offense at issue" or severed and tried separately. In the former situation, it would be impossible for sentencing to have occurred prior to the jury's consideration of sentence on the "offense at issue"; in the latter, the vagaries of scheduling and conducting separate trials of a single defendant, within certain time limits and amidst the ordinary operation of a court calendar, would make it virtually impossible. At best, such factors would render it completely arbitrary whether a contemporaneous offense would qualify as an aggravating circumstance under subsection (d)(10).

We cannot accept the Commonwealth's argument that use of the word "imposable" would have been absurd if the Legislature had intended "convicted of" to mean that a finding of guilt had been made and sentence had been imposed. The prepositional phrase "for which a sentence of life imprisonment was imposable" refers back to, and is descriptive of, the offense which if the defendant has been "convicted" thereof may be considered an aggravating circumstance. Because the phrase modifies the noun "offense" rather than the verb "convicted", by itself it sheds no appreciable light on the shade of meaning to be attributed to the latter. We note, however, that the second part of subsection (d)(10), allowing as an aggravating circumstance that "the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense," appears to be co-extensive with the situation which would exist where a defendant has been found guilty and had a life sentence imposed. Were we to read the first part of the statute as the Appellants suggest, the second section would be surplus verbiage. Because the Legislature is not presumed to have intended the provisions of its enactments as mere surplusage, *Masland v. Bachman,* 473 Pa. 280, 374 A.2d 517 (1977), the Appellants' position is untenable. For these reasons, we find that, as used in 42 Pa.C.S. § 9711(d)(10), the legislature evidenced a clear in-

tent that "convicted" mean "found guilty of" and not "found guilty and sentenced." [1]

Appellants also put forward several allegations of improper argument by the prosecutor at the sentencing hearing. Lesko contends that the prosecutor exceeded the bounds of proper argument when he commented on Lesko's failure to show remorse. Lesko took the stand at the sentencing hearing and testified to details of his life history—the orphanages at which he stayed, the schools he attended, his service record—up until the time he first met Travaglia. The prosecutor did not cross-examine Lesko. In his argument to the jury, the prosecutor stated:

John Lesko took the witness stand, and you've got to consider his arrogance. He told you about how rough it was, how he lived in hell, and he didn't even have the common decency to say I'm sorry for what I did. I don't want you to put me to death, but I'm not even going to say that I'm sorry.

(N.T., p. 1697).

Although Travaglia did not take the stand, and the prosecutor made no direct comment on his failure to indicate remorse, he argues that the prosecutor's comments as to Lesko improperly implied that he, Travaglia, had a burden to take the stand and show remorse.

Lesko cites cases for the proposition that when a defendant testifies as to a collateral matter, the prosecutor is not permitted to comment adversely upon his refusal to testify on the merits of the charge against him. *See, e.g., Commonwealth v. Camm,* 443 Pa. 253, 277 A.2d 325 (1971). The rationale for this rule is that such comment would run counter to the privilege against self-incrimination and the defendant's presumption of innocence. It is important to note that the argument complained of here was delivered

1. Appellant Lesko has, in a separate appeal, No. 41 W.D. Appeal Dkt. 1982, raised a claim of ineffective assistance of counsel in the Indiana County case based on his attorney's advice to plead guilty. This matter is treated in a separate opinion filed this day and reported at 502 Pa. 511, 467 A.2d 307.

during the sentencing phase of Appellants' trial. Lesko and Travaglia had already been tried and found guilty of first degree murder. The Commonwealth had been put to its proof and, without any infringement on the defendants' privilege against self-incrimination, the presumption of innocence had been overcome beyond a reasonable doubt. We must keep in mind that the "sentencing phase" of the trial has a different purpose than the "guilt phase" and different principles may be applicable. For example, the privilege against self-incrimination in its pure form has no direct application to a determination of the proper sentence to be imposed; the purpose of the prosecutor is not to "incriminate," and the goal of the guilty defendant is not to avoid "incrimination." Likewise, the presumption of innocence which accompanies the accused throughout proceedings to determine his guilt has no direct application to the sentencing determination. This is reflected in the fact that the sentencing statute, without running afoul of the federal or state constitutions, places a burden on the defendant of proving mitigating circumstances by a preponderance of the evidence. It may be acknowledged that in some sense there is a "presumption of life"—this from the fact that the prosecution is limited to specified aggravating circumstances which must be proven beyond a reasonable doubt, while a defendant is permitted great latitude in demonstrating mitigating circumstances, and then by the lesser preponderance of evidence standard. This presumption, if it be called such, does not, however, support the reasoning or the rule which Appellants argue for excluding comment on the failure to show remorse.

It should not go unnoticed that the demeanor of a convicted defendant, including his apparent remorse, is a proper factor for consideration by the court in fixing sentence in noncapital cases. We find no reason in policy or logic why the jury in a capital case, which is the sentencing authority, should be prevented from considering this same information. Had the prosecutor launched an extended tirade on this point, thereby focusing undue attention on the

remorse factor, Appellants' claim of prejudice might have greater force. It is clear from examining the prosecutor's argument as a whole that he made only this single reference to remorse, which amounted to a suggestion that this was a factor which the jury should consider. We also note that the court in its charge instructed the jury that the defendants had no obligation to testify and that no adverse inference should be drawn from their failure to testify. We therefore find no error arising out of these comments.

The Appellants argue further impropriety in statements of the prosecutor which they characterize as calculated to arouse the prejudice and sympathy of the jury against them. Appellants first call attention to the prosecutor's statement:

> So I'll say this: Show them sympathy. If you feel that way, be sympathetic. Exhibit the same sympathy that was exhibited by these men on January 3, 1980. No more. No more.

(N.T., p. 1701).

It is axiomatic that a statement must be read in context in order to assess its propriety. We therefore set out at length the portion of the prosecutor's argument which immediately preceded the challenged statement:

> But I have a problem. Each one of you promised me, promised the judge, Mrs. Ambrose, Mr. Bertani, Mr. McCormick, Mr. Marsh and the defendants, when we started, that you would follow the law. You all promised that you wouldn't become a social activist. But I can't stop that. I can't stop you from walking out into that deliberation room after the judge charges you and saying to yourself, The Commonwealth has proved one or more aggravating circumstances, and there's no mitigating circumstances here at all, and the law says I must find these defendants and sentence them to death, but I won't do that, because I feel sympathy. And I also can't stop you from saying, well, I found one or more aggravating circumstances that have been proven beyond a reasonable doubt, and although I found mitigating circumstances, the aggravating circumstances outweigh them, and the law

says that I must return a death penalty, but I won't, I'm going to show sympathy. I just can't stop you from doing that.

*Id.*

■ It is clear from reading this argument as a whole that the prosecutor was seeking to remind the jury that sympathy was not a proper consideration, but that if they were inclined to be sympathetic they should temper their sympathy. [This, in fact, was the essence of the trial court's instruction—that sympathy was not a factor to be considered in the jury's deliberations, that there was sympathy on both sides of the case. (N.T. p. 1706) ]. This was not an improper argument for the prosecutor to have made.

■ Appellants argue further that the prosecutor erred in this statement by making reference to the victim. They cite *Commonwealth v. Lipscomb,* 455 Pa. 525, 317 A.2d 205 (1974); *Commonwealth v. Cronin,* 464 Pa. 138, 346 A.2d 59 (1975); and other cases wherein this Court has disapproved prosecutorial arguments which invite consideration of the murder victim. We observe that these cases all treat closing arguments made during trials for the purpose of determining guilt or innocence, where the defendant is still clothed with a presumption of innocence. A large part of the reason why these arguments invoking the memory of the victim were disfavored was the prosecutor's implication of his personal belief in the guilt of the accused. *See, e.g., Commonwealth v. Cronin.* [Argument that " '[T]he only way you cannot find this defendant guilty of murder of the first degree is for [the victim] to walk through that door,' " 464 Pa. at 141, 346 A.2d at 61, disapproved as " 'amount[ing] to a statement by the prosecutor that he was personally convinced that the appellant was guilty, and his innocence was as unlikely as the deceased's resurrection.' " *Id.,* 464 Pa. at 142, 346 A.2d at 61, quoting from *Commonwealth v. Lark,* 460 Pa. 399, 404–405, 333 A.2d 786, 789 (1975) ]. We again observe that the balance of principles which results in certain rules being appropriate at the "guilt phase" of a trial, may be struck differently at a hearing to determine appro-

priate penalty. The prosecutor's statement of his personal belief in the defendants' guilt can in no way be prejudicial where guilt has already been determined.

■ Prejudice might otherwise arise from reference to the victim if such reference has the effect of arousing the jury's emotions to such a degree that it becomes impossible for the jury to impose sentence based on consideration of the relevant evidence according to the standards of the statute. We find the statements of the prosecutor in this case to have made minimal reference to the victim. Indeed, the memory of both Leonard Miller and William Nicholls was first invoked by counsel for Appellant Travaglia ("And Leonard Clifford Miller is dead, and there's no question about that. Mr. Nicholls is dead; there's no question about that. If the killing of Mike Travaglia can bring back those people, then there would be a legitimate reason for killing Mike Travaglia. Because then you bring back those people to their families, and you give something back; you create something from what you're doing. But you cannot do that." N.T. p. 1677).

Reading the arguments at the sentencing hearing as a whole, we find that the prosecutor's argument was carefully tailored to demonstrate the proof of aggravating circumstances, to refute the proof of mitigating circumstances, and to correct extraneous arguments introduced by the defense. We find no prejudice from the challenged statements making oblique reference to the victim.

■ Finally, we address Appellants' arguments that the prosecutor's final statement to the jury was inflammatory. The prosecutor stated, "Right now, the score is John Lesko and Michael Travaglia two, society nothing. When will it stop? When is it going to stop? Who is going to make it stop? That's your duty." Appellants characterize this statement as an improper appeal to vengeance which requires reversal of the death sentences. As we read the record, the arguments presented by defense counsel were to a large extent directed toward demonstrating that there was

no rational reason for the existence of the death penalty, that it served no useful purpose. The prosecutor opened his argument by pointing out that the legislature in its lawmaking function had enacted the death penalty and had already decided that there is a rational reason and that the penalty does serve a useful purpose. He returned to this theme, and prefaced the comment complained of by requesting "I want you to remember this: We have a death penalty for a reason." N.T. p. 1701. The prosecutor is permitted, by the terms of the statute, to argue in favor of the death penalty. 42 Pa.C.S. § 9711(a)(3). Taken in context, we find the prosecutor's comment to have been no more than permissible "oratorical flair" in arguing in favor of the death penalty.[2]

## III. PROPORTIONALITY REVIEW

Consistent with decisions of the United States Supreme Court, *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976); prior decisions of this Court, *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); and the sentencing statute, 42 Pa.C.S. § 9711(h)(3)(iii), "this Court will conduct an independent evaluation of all cases decided since the effective date of the sentencing procedures under consideration (September 13,

---

**2.** The Appellants also allege other instances of error which, having carefully reviewed the record and the precedents, we must reject. Arguments that the exclusion of veniremen conscientiously opposed to the death penalty violates due process and the Appellants' right to a fair trial, and that the imposition of the death penalty is "cruel and unusual" punishment, have been previously ruled upon by this Court. *See Commonwealth v. Brown,* 462 Pa. 578, 342 A.2d 84 (1975), *and Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), respectively. Arguments that the Appellants were denied their rights to speedy trial under the Federal and State Constitutions and Rule 1100, that the trial court erred in not quashing the information which charged both conspiracy and homicide, and that the trial court erred in not charging the jury that they could find Lesko guilty of a different degree of murder than Travaglia, are without merit. No jurisprudential value would be served by further discussion of these points.

1978)." *Zettlemoyer,* 500 Pa. at 62, 454 A.2d at 961. This review "will utilize all available judicial resources and will encompass all similar cases, taking into consideration both the circumstances of the crime and the character and record of the defendant in order to determine whether the sentence of death is excessive or disproportionate to the circumstances." *Id.*[3]

■ Our research indicates that three cases in which "[t]he victim was a fireman, peace officer or public servant concerned in official detention ... who was killed in the performance of his duties," 42 Pa.C.S. § 9711(d)(1), have proceeded to jury verdict under the Act of September 13, 1978. The cases are *Commonwealth v. Benjamin Terry,* Montgomery County Court of Common Pleas, Criminal Division, No. 1563–79, docketed on appeal with this Court, 80–3–595, argued April 19, 1983[4]; *Commonwealth v. Edward McNeil,* Philadelphia County Court of Common Pleas, Criminal Division, CP 80 Nov. 969–71; and *Commonwealth v.*

3. We note that the United States Supreme Court has granted certiorari to the Court of Appeals for the Ninth Circuit in the case of *Pulley v. Harris,* —— U.S. ——, 103 S.Ct. 1425, 75 L.Ed.2d 787 (1983), decision below reported *sub nom. Harris v. Pulley,* 692 F.2d 1189 (9th Cir.1982). The questions presented for review are "(1) Does the Constitution, in addition to procedures whereby trial court and jury impose death sentence, require any specific form of 'proportionality review' by court of statewide jurisdiction prior to execution of state death judgment? (2) If so, what is the constitutionally required focus, scope, and procedural structure of review?"

4. On appeal, this Court remanded the case for a new trial, 501 Pa. 626, 462 A.2d 676 (1983), because the lower court had improperly allowed the jury, during their deliberations, to have possession of a copy of a paraphrased, written version of the defendant's confession, a violation of Pa.R.Crim.P. 1114(a). We cannot, therefore, presently consider the case as having proceeded to jury verdict. We must note, however, that throughout much of our deliberation on the cases at bar, *Terry* was considered as a "similar case" for purposes of comparison. To the extent that our review for excessiveness or disproportionality involves determining whether or not juries generally, across the Commonwealth, find death to be an appropriate punishment for the crime, *Terry* has some limited value. Even if we remove *Terry* from consideration entirely, however, our conclusion remains unchanged.

*Leslie Beasley,* Philadelphia County Court of Common Pleas, Criminal Division, CP 80 July 2175–2178.

In *Terry,* the defendant was an inmate serving three life sentences for murder. He was found guilty of first degree murder in the bludgeoning death of a guard at the State Correctional Institution at Graterford. The jury sentenced him to death. In *Beasley,* after finding him guilty of shooting an on-duty police officer, the jury sentenced the defendant to death. In *McNeil,* the defendant shot and killed a police officer who was at the scene where the defendant had been shooting at his wife and children. The jury convicted the defendant of first degree murder and imposed a life sentence.

We have searched the records of these cases available to this Court for information as to the character of the defendants (e.g. intelligence, family background, psychiatric history, previous criminal record), and the circumstances, both aggravating and mitigating, of their crimes. We find that the sentence of death is not excessive or disproportionate to the penalty imposed in these similar cases. We also find that the evidence supports "the finding of an aggravating circumstance specified in subsection (d)," 42 Pa.C.S. § 9711(h)(3)(ii), and that the sentences were not "the product of passion, prejudice or any other arbitrary factor," 42 Pa.C.S. § 9711(h)(3)(i).[5] We therefore must affirm the sentences of death.

**5.** The Dissenting Opinion of Mr. Chief Justice Roberts reiterates his position in *Zettlemoyer,* 500 Pa. at 77–81, 454 A.2d at 969–971. That position, however, is based on two premises which, if subjected to careful analysis, must be considered faulty.

The first premise is that "the sentence imposed forecloses the availability of those subsequent [Post-Conviction Hearing Act] proceedings" which are available for appellants to challenge the effectiveness of counsel in "conventional" cases. *Zettlemoyer,* 500 Pa. at 79, 454 A.2d at 970. The authority cited for this proposition is 42 Pa.C.S. § 9711(i), paraphrased "record to be transmitted to Governor at close of this Court's review." *Id.* The full text of this section, however, reads:

Where a sentence of death is upheld by the Supreme Court, the prothonotary of the Supreme Court shall transmit to the Governor

NIX, J., filed a concurring opinion.

ROBERTS, C.J., filed a dissenting opinion.

a full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court.

42 Pa.C.S. § 9711(i) (emphasis added). Contrary to the implication of the Dissent, the statute does not require that the *official* record be transmitted to the Governor. Nor does the statute in any other way, either expressly or impliedly, remove the case from the jurisdiction of the courts or prevent further action by the courts.

It is to be noted also that the Majority Opinion in *Zettlemoyer* contains a similar conclusory statement that "due to the final and irrevocable nature of the death penalty, the appellant will have no opportunity for post-conviction relief wherein he could raise, say, an assertion of ineffectiveness of counsel ..." 500 Pa. at 50 n. 19, 454 A.2d at 955 n. 19. Offered in support of the rationale for relaxing the waiver rule and considering issues raised for the first time before this Court or even raised *sua sponte* by this Court, the statement is clearly dictum.

The second premise of the Dissent in *Zettlemoyer,* quoted in the present Dissenting Opinion, is that "[u]ntil a hearing on counsel's effectiveness has been held, this Court cannot fairly state that it has discharged its statutory duty to provide a thorough review of the judgment of sentence of death." 500 Pa. at 81, 454 A.2d at 971. Although "thorough" is perhaps an appropriate *general* characterization of this Court's reviewing function in death penalty cases, it must not be overlooked that 42 Pa.C.S. § 9711(h) is quite *specific* in its description of this Court's duty in reviewing a sentence of death. Thus,

(2) In addition to its authority to correct errors at trial, the Supreme court shall either affirm the sentence of death or vacate the sentence of death and remand for the imposition of a life imprisonment sentence.

(3) The Supreme Court *shall affirm* the sentence of death *unless* it determines that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the finding of an aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.

(Emphasis added.) Although ineffectiveness of counsel might be classified as an "arbitrary factor" within subsection (3)(i), unless it is raised by the appellant or some hint of its presence is suggested by the record so as to cause this Court to raise the issue *sua sponte,* it is inconceivable how the issue can come before the Court on direct appeal.

NIX, Justice, concurring.

I am fully in accord with the majority's affirmance of the verdicts of guilt in these appeals. My concern is directed to the majority's disposition of the objection to the allowance into evidence as an aggravating circumstance of the appellants' guilty pleas to the homicide charges in Indiana County (the William C. Nicholls killing). The majority focused its analysis upon whether the term "convicted" as used in section 9711(d)(10), 42 Pa.C.S. § 9711(d)(10), requires the imposition of sentence before such evidence can be admissible for this purpose.[1] In my judgment the issue raised is the finality of the conviction that is being offered as an aggravating circumstance. Where as here there have been challenges to the pleas entered in Indiana County,[2] I am convinced that section 9711(d)(10) must be interpreted as providing for review by this Court of those claims prior to the execution of the judgments of sentence of death affirmed by the Court today. I therefore join in the Court's mandate

1. Section 9711(d)(10) provides:
   (d) Aggravating circumstances.—Aggravating circumstances shall be limited to the following:
   $$* \quad * \quad * \quad * \quad * \quad *$$
   (10) The defendant has been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was imposable or the defendant was undergoing a sentence of life imprisonment for any reason at the time of the commission of the offense.

2. Appellant Travaglia filed a motion to withdraw his guilty plea to the Indiana County charge on January 23, 1981, during the trial of the instant case. That motion was denied on April 30, 1981 and Travaglia was sentenced to a term of life imprisonment. There is no indication in the record whether an appeal was taken from that judgment of sentence.
   Appellant Lesko initially filed a motion to withdraw his guilty plea in the Indiana County case on December 3, 1980, prior to the trial in Westmoreland County, and filed an amended motion to withdraw on April 13, 1981. His motion, as amended, was denied on June 5, 1981. Lesko's challenge to that denial was rejected, and he was sentenced on July 17, 1981 to a term of life imprisonment. Lesko appealed to the Superior Court, which transferred the appeal to this Court. In *Commonwealth v. Lesko,* 502 Pa. 511, 467 A.2d 307 (1983), this Court affirmed the judgment of sentence. Thus as to Lesko my concern expressed here is satisfied.

today with the caveat that the death penalty will be carried out only after a review of those complaints by this Court and only if after such review it is determined that the pleas were voluntarily and knowingly entered and the request for withdrawal was properly refused.

In *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), the United States Supreme Court painstakingly stressed the importance of the sentence-review function to be undertaken by the state's highest tribunal where the death penalty has been imposed. As noted by that Court in *Zant v. Stephens,* —— U.S. ——, ——, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235, 255 (1983): "[A]lthough not every imperfection in the deliberative process is sufficient, even in a capital case, to set aside a state court judgment, the severity of the sentence mandates careful scrutiny in the review of any colorable claim of error." Surely an attack upon the validity of a guilty plea that has been used as the basis for a finding of an aggravating circumstance constitutes the type of contention that must be reviewed before the execution of the capital sentence may be allowed.

An interpretation of section 9711(d)(10) which provides for such a final review by this Court of a challenge of this nature is also dictated by the law of this Commonwealth. Our Constitution mandates a right of appeal in all cases. Pa. Const. art. V, § 9; *see* Section 5105 of the Judicial Code, 42 Pa.C.S. § 5105. Moreover, our case law has recognized the qualitative difference between death and any other permissible form of punishment by relaxing rules of waiver which would otherwise preclude review of the merits of claims where the death sentence has been imposed. *See Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied sub nom. Zettlemoyer v. Pennsylvania,* —— U.S. ——, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *Commonwealth v. McKenna,* 476 Pa. 428, 383 A.2d 174 (1978). In light of such precedent, it would clearly create an anomaly to foreclose a challenge upon the validity of a plea of guilt where that plea constitutes the aggravating circumstance upon which the death sentence is predicated.

It must be recognized that the validity of each aggravating circumstance is an important consideration even where there may be more than one aggravating circumstance upon which the jury could have reached its decision. Pennsylvania's death penalty statute provides that where the jury finds the existence of both aggravating and mitigating circumstances the jury must then engage in a "weighing" process. If, after the weighing process, the jury determines that the aggravating circumstances outweigh the mitigating circumstances, it must return the death sentence. 42 Pa.C.S. § 9711(c)(iv). It is evident that this weighing process is squarely within the province of the jury and that a reviewing court cannot determine with any certainty the exact weight which the jury attached to each aggravating and mitigating circumstance.[3] In a case involving a decision as important as life and death we are not in a position to speculate about what decision the jury might have reached had it not considered one particular aggravating circumstance. Therefore, if the validity of even one aggravating circumstance is in dispute,[4] the death sentence should not be executed until the resolution of that dispute has become final.

**3.** *See Williams v. State,* 274 Ark. 9, 621 S.W.2d 686 (1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 460, 74 L.Ed.2d 611 (1983); *Elledge v. State,* 346 So.2d 998 (Fla.1977); *State v. Irwin,* 304 N.C. 93, 282 S.E.2d 439 (1981); *State v. Moore,* 614 S.W.2d 348 (Tenn.1981); *Hopkinson v. State,* 632 P.2d 79 (Wyo.1981), *cert. denied sub nom. Hopkinson v. Wyo.,* 455 U.S. 922, 102 S.Ct. 1280, 71 L.Ed.2d 463 (1982).

**4.** In the case of *Zant v. Stephens,* —— U.S. ——, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the U.S. Supreme Court held that under a state statute which did not require this weighing process, and where no suggestion is made that the presence of more than one aggravating circumstance should be given special weight, the subsequent invalidity of one of the aggravating circumstances does not invalidate the death sentence. The court in *Zant* stated the following:

> [W]e note that in deciding this case we do not express any opinion concerning the possible significance of a holding that a particular aggravating circumstance is "invalid" under a statutory scheme in which the judge or jury is specifically instructed to weigh statutory aggravating and mitigating circumstances in exercising its discretion whether to impose the death penalty.

*Id.* at ——, 103 S.Ct. at 2750, 77 L.Ed.2d at 258.

Moreover, in view of our statutory responsibility to thoroughly review the record in death penalty cases, the resolution of any such dispute within the jurisdiction of this Commonwealth must be made by this Court.[5] Such disputes need not be decided within the context of the death penalty appeal; for example, appellant Lesko's guilty plea challenge, lodged initially in the Superior Court, was decided by this Court in a separately briefed and argued appeal.[6] However, where an appeal which has bearing on the validity of an aggravating circumstance relied upon in arriving at the death sentence is pending in another court of this Commonwealth at the time that sentence is reviewed by this Court, at least that portion of such appeal which affects the efficacy of the aggravating circumstance should be certified to this Court for disposition. Where a proceeding which has given rise to a finding of an aggravating circumstance is at the pre-sentencing stage, a direct appeal to this Court should be permitted upon sentencing. Until we have disposed of such related appeals this Court's statutorily mandated review of the death sentence is not complete, and execution of sentence should be stayed.

ROBERTS, Chief Justice, dissenting.

Because appellants are presently represented by the same counsel who represented them at trial and at the death penalty hearing, there has been no meaningful inquiry into whether appellants have been afforded their constitutional right to the effective assistance of counsel. In the absence

5. Where an aggravating circumstance such as a conviction in the court of another state or in federal court is at issue, such a dispute will be considered resolved when passed upon the highest court of that jurisdiction.

6. *See* footnote (2), *supra*. As noted in that footnote, the status of appellant Travaglia's guilty plea remains to be established. In light of this Court's pronouncement in *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied sub nom. Zettlemoyer v. Pennsylvania*, —— U.S. ——, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983); *Commonwealth v. McKenna*, 476 Pa. 428, 383 A.2d 174 (1978), a subsequent challenge to the validity of that plea may not be assumed to be waived.

of such an inquiry, the reasons for counsel's strategy, which do not appear of record, cannot be known, and it cannot be determined whether there existed evidence which should have been presented by counsel but was not.

Accordingly, the record should be remanded for the appointment of new counsel, who would be obliged to submit a petition to the court of common pleas addressing the effectiveness of trial counsel. As previously stated, "[u]ntil a hearing on counsel's effectiveness has been held, this Court cannot fairly state that it has discharged its statutory duty to provide a thorough review of the judgment[s] of sentence of death." *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 77, 454 A.2d 937, 971 (1982) (Roberts, J., joined by O'Brien, C.J., dissenting).