J-A01039-19

2019 PA Super 157

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
: PENNSYLVANIA
:
v. :
:
:
:
:
BRANDON SMITH :
:
Appellant : No. 3573 EDA 2017

Appeal from the Judgment of Sentence Entered September 19, 2017
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0004956-2015

BEFORE: OTT, J., STABILE, J., and McLAUGHLIN, J.

OPINION BY McLAUGHLIN, J.: **FILED MAY 14, 2019**

Brandon Smith appeals from the judgment of sentence entered following his jury trial convictions for second-degree murder, robbery, and related offenses.[1] Smith argues that the court erred in denying his motion to suppress his statement to the police and in sentencing him to a mandatory minimum sentence of 30 years' incarceration. We affirm.

Just before 8:30 p.m. on March 12, 2015, James Stuhlman was shot and killed while he was walking his dog. Six days later, on March 18, 2015, police arrested Smith, who was 15 years old at the time, and took him to the homicide unit for questioning. Smith made a statement in which he confessed that he, Alston Zou-Rutherford, and Tyfine Hamilton had planned to commit a robbery and split the proceeds. They walked around for 20 minutes while

---

[1] Smith was convicted of committing second-degree murder, robbery, conspiracy to commit robbery, and possession of an instrument of crime. **See** 18 Pa.C.S.A. §§ 2502(b), 3701(a)(1), 903, and 907, respectively.

looking for someone to rob. Hamilton had a firearm. When they saw Stuhlman, they decided to rob him, because "even the dog looked weak and small." Statement, 3/18/15, at 2. Smith and Hamilton approached Stuhlman while Zou-Rutherford stood behind as a lookout. Hamilton instructed Stuhlman to give them his belongings, and Smith instructed him to put his belongings on the ground. When Stuhlman reached for Hamilton's gun, Hamilton shot him.

The police filed charges against Smith. Prior to trial, Smith moved to suppress his statement. The testimony presented at the suppression hearing was as follows.

Detective Thomas Gaul testified that Smith was arrested at approximately 6:30 p.m., and Detective Gaul met him approximately three hours later, around 9:25 or 9:30 p.m. By that time, other law enforcement officers had already questioned Smith's brother, Zou-Rutherford. Zou-Rutherford had confessed that both he and Smith were involved in the shooting, and Detective Gaul had learned the substance of Zou-Rutherford's confession.

Detective Gaul initially spoke with Smith for approximately ten or 15 minutes, during which time he introduced himself and told Smith he was a suspect in the shooting. Shortly thereafter, Detective Gaul attempted to contact Victoria Zou, Smith's legal guardian, who Smith refers to as his mother. He left her a voicemail message.

Detective Gaul then read Smith his *Miranda*[2] rights, and Smith completed, initialed, and signed a form reflecting that he was waiving his *Miranda* rights. The form, which was introduced into evidence at the hearing, stated that the police were questioning Smith in relation to a murder/robbery. Detective Gaul testified that Sergeant Robert Wilkins was also present during the administration of the *Miranda* warnings.

Detective Gaul testified that four or five minutes after he left Zou a voicemail, she returned his call and spoke with Detective Thorsten Lucke. Detective Lucke thereafter communicated to Detective Gaul that Zou had given her permission for the detectives to question Smith.

Detective Gaul testified that after Smith waived his *Miranda* rights, he and Smith had a discussion wherein Smith confessed to his involvement in the shooting. Detective Gaul stated that Sergeant Wilkins and Detective Lucke were also present during the questioning, intermittently.

Detective Gaul testified that he did not promise Smith anything in exchange for his cooperation or tell Smith that he would be permitted to go home if he made a statement. Detective Gaul stated he told Smith that his involvement in a murder could potentially result in life imprisonment. Detective Gaul claimed he encouraged Smith to cooperate by telling him the following:

> [Y]ou know all of the people that have been brought in within these last few hours and if you are confident enough if they are

---

[2] *Miranda v. Arizona*, 384 U.S. 436 (1966).

going to be able to stand all this pressure that is going on—because it is pressure—everyone is brought in, everything is coming together[.]

N.T., 4/18/17, at 173. Detective Gaul stated, "that is the only thing I laid upon him." *Id.*

Detective Gaul testified that Smith did not ask to speak with anyone the entire evening, and was "adamant" that he did not want a lawyer or Zou present. *Id.* at 168, 172. Detective Gaul testified that Smith "was very clear as to everything that was going on" and "[t]he whole time [he was] dealing with him, he understood clear and concise everything that was going on." *Id.* at 13-14, 170. Detective Gaul stated, "You could tell he knew exactly what he was doing." *Id.* at 168. Detective Gaul testified that Smith said he had prior experience within the criminal justice system, and that he had previously been detained for a robbery and that he gave a statement to the police after waiving his *Miranda* rights.

Detective Gaul testified that his discussion with Smith was reduced to a written statement in question and answer form beginning approximately four hours after Smith's arrest, at 10:20 p.m. The written statement was introduced as evidence at the hearing. In the statement, Smith confirmed that he was not under the influence of drugs, does not suffer from mental illness, and was given the opportunity to eat, drink, and use the bathroom. Smith acknowledged he was being interviewed in reference to the murder, that he understood his *Miranda* warnings, and that he understood Zou had given permission for him to be interviewed.

Smith signed the statement, and at 11:50 p.m., signed a form in which he consented to give a video-recorded statement. Detective Gaul testified that he and Detective Lucke made a video-recording of Smith's confession around 12:30 a.m. The prosecution played the video during the hearing. Detective Gaul testified that Smith's demeanor on the video was similar to his demeanor when they were preparing the written statement.

Detective Lucke testified that he spoke with Zou when she returned Detective Gaul's phone call, around ten or 15 minutes after Detective Gaul had left her a message. Detective Lucke said that he told Zou that Detective Gaul was "busy," but that he would take a message, and that "we had reached out to her in an effort to gain her permission to speak with Mr. Smith in reference to the ongoing investigation that he was at our office for." *Id.* at 184. Detective Lucke told Zou that they were investigating a murder that occurred during a robbery, and that Smith was one of several young men the police were talking to "in effort to determine everybody's involvement[.]" *Id.* at 185. Detective Lucke testified that he told Zou,

> [W]hen Detective Gaul has a minute, when he is done speaking to your son, I can let him know he can call you or you can call here to speak with him later on and when your son is able, I would have him call you, if he desires to do so.

*Id.* at 194. According to Detective Lucke, Zou did not ask to speak to Smith, and gave the detectives her permission to question Smith. Detective Lucke testified that after the call was finished, he walked across the building to seek out Detective Gaul, and relayed to him that Zou had given her permission for

the interview. Detective Lucke testified that he did not put Zou on hold while he went to find Detective Gaul because he was not sure where Detective Gaul was, and he believed Detective Gaul could call Zou back again if necessary.

In addition to the testimony of Detectives Gaul and Lucke, the Commonwealth introduced, by stipulation, a statement made by Smith to the police in 2013 during an unrelated robbery investigation. The statement indicated that during that investigation, Zou had given the police permission to question Smith, and Smith had waived his ***Miranda*** rights.

Smith introduced, by stipulation, a psychologist's report showing that Smith's I.Q. on the Wechsler Abbreviated Scale of Intelligence ("WASI") test was 81, putting him the tenth percentile. That report also reflected that Smith's "cognitive abilities are somewhat lower than would be expected for the majority of the individuals in the population," and that Smith "performed mildly more poorly than would be expected for an average individual of his age and grade level." ***Id.*** at 203-04.

Zou testified that she was present when Smith was taken into custody, at a house where the police were executing a search warrant, and that at that time, she told Smith she would get him a lawyer. Zou testified that she called the police at 9:37 p.m. and spoke with a detective for seven minutes,[3] mainly in order to locate Zou-Rutherford. Zou testified that the detective who answered told her Smith was with another detective, who would call her back.

---

[3] Smith submitted Zou's phone records as evidence, but these were not included in the certified record.

Zou testified that the police did not offer to let her speak to Smith. According to Zou, she did not tell the police they could not talk to Smith, but also did not give them permission to speak with him. Zou testified that she has an associate's degree in criminal justice, and understands *Miranda* rights.

Finally, Smith testified. He stated that he cried throughout the interview, had asked Detective Gaul if he could speak to a lawyer or to Zou, and that Detective Gaul told him he could go home if he cooperated. However, Smith also testified that he had understood his *Miranda* rights and wanted to waive them, and that no one had threatened him or forced him to make a statement. Smith testified that he would have waived his *Miranda* rights even if Zou had not given her permission to the detectives, because he had wanted to confess. Smith testified that he was being "hardheaded," because Zou had advised him to get an attorney. *Id.* at 266. Smith stated that when he was previously questioned, in relation to another robbery, he had told the truth about his involvement, and the detectives had released him. Smith believed if he came clean about his involvement in the instant case, he would receive similar treatment. Smith stated, "I believe the truth will set you free. So that is why I was there, to tell the truth and hopefully I will get a second chance but that is just my belief." *Id.* at 271. Smith also testified that he made a statement because he did not know he could be tried as an adult.

The court denied the motion to suppress the statement. At Smith's jury trial, the Commonwealth introduced into evidence both Smith's written

statement and the video-recording of Smith adopting the content of his written statement.

Smith's brother, Zou-Rutherford, testified for the defense, and verified that he, Smith, and Hamilton had committed the robbery, and that Hamilton had pulled the trigger. Zou-Rutherford also testified that after Hamilton pointed a gun at Stuhlman, Smith told Hamilton to "chill," and that Smith's body language and facial expression at the time indicated that he did not want Hamilton to shoot Stuhlman. N.T., 4/20/17, at 43, 67, 78.

The jury found Smith guilty. The court thereafter sentenced Smith to serve 30 years to life imprisonment for the second-degree murder conviction, pursuant to 18 Pa.C.S.A. § 1102.1(c)(1). The court also sentenced Smith to a consecutive term of ten years' probation for conspiracy to commit murder, and to no further penalty on the remaining convictions.

Smith appealed, and presents two issues for our review:

A. Did not the lower court err and abuse its discretion by denying the defense motion to suppress the statement of Mr. Smith, a juvenile, because it was taken in violation of his rights to due process under the Fifth and Fourteenth Amendments to the United States Constitution, Article I, Section 9 of the Pennsylvania Constitution, and his Fifth Amendment right to remain silent pursuant to the requirements of **Miranda v. Arizona**, 384 U.S. 436 (1966), and its progeny[?]

B. Did not the sentence of thirty (30) years to life, that was statutorily required in this case by 18 Pa.C.S. § 1102.1(c)(1), violate the Eighth Amendment to the United States Constitution, in that application of the statute (1) presents a mismatch between the liability of a class of offenders (children) and the severity of penalty; (2) precludes consideration of the general and specific mitigation qualities of youth, making them irrelevant to the imposition of the mandatory minimum sentence[;] and (3) due in

part significantly reduced life expectancy in prison, unconstitutionally impairs the rehabilitative ideal enshrined in *Graham v. Florida*, 560 U.S. 48, 74 (2010) and *Miller v. Alabama*, 567 U.S. 460, 473 (2012)[?]

Smith's Br. at 4 (answers below omitted).

## I. Motion to Suppress

Smith argues the court erred in denying his motion to suppress the statement he made to the police for three reasons. First, Smith contends that the interrogation was coercive because Detective Gaul told Smith that the other people the police were questioning would not be able to withstand police pressure and might confess before Smith did. Specifically, Smith complains that Detective Gaul advised Smith,

> [Y]ou know all of the people that have been brought in within these last few hours and if you are confident enough if they are going to be able to stand all this pressure that is going on— because it is pressure—everyone is brought in, everything is coming together[.]

N.T. 4/18/17, at 173. Smith contends these words were designed to interfere with his evaluation of his need for counsel and to induce him to confess. Smith additionally argues that the Commonwealth's evidence "did not disprove" that Detective Gaul said these words to Smith before he administered the *Miranda* warnings. Smith's Br. at 28.

Second, Smith argues the police actively prevented him from consulting with Zou, an interested adult, prior to the interrogation. Smith points out that Detective Gaul testified he started speaking with Smith before calling Zou and before reading Smith his *Miranda* warnings. According to Smith, during that

time, Detective Gaul had already begun pressuring Smith. Smith also argues that Detective Gaul administered the **Miranda** warnings and began interrogating Smith before they received permission from Zou. Smith additionally argues that when Zou called and asked to speak with Detective Gaul, Detective Lucke told her Detective Gaul was "busy" and that she could not speak to him until the interrogation was over. Smith argues that Detective Lucke's testimony that he did not put Detective Gaul on the phone because he did not know where to find Detective Gaul was incredible. Smith also complains that Detective Lucke did not tell Zou that Smith was a murder suspect, or explain to her Smith's rights under **Miranda**.

Finally, Smith argues that his age, experience, psychological state, and comprehension level all demonstrate that his waiver of his **Miranda** rights was not intelligent. Smith was fifteen and one-half years old at the time. He claims he was "cognitively compromised," as he received the same score on the WASI test, 81, as the defendant in **Commonwealth v. Williams**, 61 A.3d 979, 980 (Pa. 2013), whom the Supreme Court deemed mentally retarded and ineligible for the death penalty. Smith argues he clearly did not understand the gravity of his situation, as he believed he would not get into trouble if he admitted his involvement in the robbery, and there was no testimony that Smith was told he was being charged with murder before he made the oral confession. In addition, Smith claims the fact that he waived his **Miranda** rights and questioned once before, at age 13, does not indicate he had enough experience to understand the criminal system, as there was

no evidence regarding the coerciveness of that questioning or his understanding at that time.

When reviewing an order denying a suppression motion, we reverse only if the trial court's factual findings are not supported by the record or the court erred in its legal conclusions. **Commonwealth v. Knox**, 50 A.3d 732, 746 (Pa.Super. 2012). We consider only the Commonwealth's evidence and the uncontradicted evidence of the defense. **Id.**

When a defendant challenges the admission of a statement made during a custodial interrogation, the Commonwealth bears the burden to prove by a preponderance of the evidence that the defendant's **Miranda** waiver was knowing, intelligent, and voluntary. **In re T.B.**, 11 A.3d 500, 505 (Pa.Super. 2010). We engage in a two-part inquiry:

> First[,] the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception. Second, the waiver must have been made with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if the "totality of the circumstances surrounding the interrogation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that **Miranda** rights have been waived.

**Id.** at 505-06 (quoting **Commonwealth v. Cephas**, 522 A.2d 63, 65 (Pa.Super. 1987)).

An examination of the totality of the circumstances includes a consideration of "(1) the duration and means of an interrogation; (2) the defendant's physical and psychological state; (3) the conditions attendant to

the detention; (4) the attitude of the interrogator; and (5) 'any and all other factors that could drain a person's ability to withstand suggestion and coercion.'" ***Id.*** at 506 (quoting ***Commonwealth v. Nester***, 709 A.2d 879, 882 (Pa. 1998)). When the defendant is a juvenile, the inquiry also includes "a consideration of the juvenile's age, experience, comprehension and the presence or absence of an interested adult." ***id.*** (quoting ***In Interest of N.L.***, 711 A.2d 518, 520 (Pa.Super. 1998)).

We first address Smith's contention that Detective Gaul coerced Smith to waive his rights and confess by stressing to him the likelihood that one of his friends would confess first. This argument is waived by Smith's failure to argue it at the suppression hearing or otherwise raise it before the trial court. ***See*** Pa.R.A.P. 302(a); N.T., 4/18/17, at 283-99. Further, in his Rule 1925(b) statement, Smith complains the statement was involuntary "based on the totality of circumstances, which include but are not limited to, [Smith's] youth and that he was not given the chance to consult with an interested adult." Rule 1925(b) Statement at 1-2. Because Smith failed to raise this aspect of his argument with specificity in his Rule 1925(b) statement, the trial court's Rule 1925(a) opinion does not refer to this particular statement by Detective Gaul. This challenge is therefore also waived by Smith's failure to include it in his Rule 1925(b) statement. Pa.R.A.P. 1925(b)(4)(ii) (requiring a Rule 1925(b) statement to "concisely identify each ruling or error that the appellant intends to challenge with sufficient detail to identify all pertinent issues for the judge").

Even if Smith had properly preserved this issue, it would not merit relief. Police may make coercive statements when questioning suspects, so long as the totality of the circumstances suggests the confession was voluntary. *Commonwealth v. Roberts*, 969 A.2d 594, 601 (Pa.Super. 2009); *see also Commonwealth v. Jones*, 322 A.2d 119, 126 (Pa. 1974). Police may even tell a juvenile defendant they have other evidence of his guilt—whether or not they do—in order to induce a *Miranda* waiver and confession. *See Jones*, 322 A.2d at 126-27 (affirming denial of suppression where police falsely informed 17-year- old defendant that another suspect had inculpated him before defendant waived his *Miranda* rights and confessed); *Commonwealth v. Fogan*, 296 A.2d 755, 757-58 (Pa. 1972) (affirming denial of suppression where police told 17-year-old defendant with an 84 I.Q. that his fellow gang-member implicated him as the shooter, and defendant waived his *Miranda* rights and confessed). Here, even assuming Detective Gaul made the complained-of statement in the ten or 15 minutes before he advised Smith of his *Miranda* rights, it is uncontested that Smith did not confess his involvement in the murder until after he waived his *Miranda* rights. And, the information imparted by Detective Gaul—that the police were questioning other suspects in relation to the crime—was not of the sort so coercive as to render Smith's waiver involuntary. *See Jones*, 322 A.2d at 126-27; *Fogan*, 296 A.2d at 757-58.

We next address Smith's second contention, that the police prevented him from speaking with an interested adult. His argument has no basis in law

or fact. A juvenile has no *per se* right to speak with an interested adult prior to questioning by the police. ***See T.B.***, 11 A.3d at 507. Rather, whether a juvenile defendant was afforded the opportunity to speak with an interested adult before waiving ***Miranda*** rights is but one factor in the totality-of-the-circumstances analysis the court must apply when determining whether the waiver was knowing, intelligent, and voluntary. ***Id.***

Because the totality of the circumstances varies from case to case, we have both affirmed and reversed orders denying suppression where a juvenile defendant waived ***Miranda*** without first consulting with an interested adult. ***Compare Knox***, 50 A.3d at 747 (affirming denial of suppression in murder trial where 17-year-old defendant's father declined to come to police station, court credited detective's testimony that defendant understood what was happening, defendant had a prior adjudication for robbery, questioning was brief, and statement was exculpatory) ***with T.B.***, 11 A.3d at 507-09 (holding waiver not knowing and intelligent where 15-year-old defendant had I.Q. of 67, no prior experience with legal system, and no consultation with an interested adult prior to his ***Miranda*** waiver; although defendant's mother gave police consent to question him, police did not apprise her of defendant's ***Miranda*** rights).

Here, the trial court found as a fact that Zou gave the police her permission to speak to Smith. Trial Court Opinion, filed February 26, 2018, at 14. The court also found that Zou understood that Smith was being questioned in relation to a murder, and credited Zou's own testimony that she understood

Smith's ***Miranda*** rights. N.T., 4/18/17, at 322. In addition, the court credited Smith's testimony that he understood his ***Miranda*** rights because he had previously waived them when he was questioned in connection to a prior robbery, and that he intended to waive his rights and make a statement regardless of whether Zou granted the police permission. ***Id.*** at 323, 326; Tr. Ct. Op. at 14. We add that Detective Lucke testified Zou gave her permission even though he told her that the interrogation would not proceed without it, and that Zou did not ask to see Smith. Detective Gaul testified Smith was adamant he did not want Zou or an attorney present during questioning. We cannot conclude that the police violated Smith's constitutional rights by questioning him even though he had not consulted with Zou.

Moreover, the trial court considered the totality of the circumstances in concluding that Smith's waiver was knowing, intelligent, and voluntary. The court found that the questioning was not protracted and that Smith was not under the influence of any substance or deprived of food, drink, or use of a bathroom. Tr. Ct. Op. at 14; N.T., 4/18/17, at 324-25. The court found no one threatened Smith or otherwise forced him to make a statement. Tr. Ct. Op. at 15; N.T., 4/18/17, at 324. The court credited Detective Gaul's testimony that he did not promise Smith he could go home if he made a statement. N.T., 4/18/17, at 324. The court recounted Detective Gaul's testimony that Smith "appeared to understand what was going on, that his answers were clear and concise, [and] that he told [Smith] what [Smith] is implicated in had the potential to get [him] a life sentence." ***Id.*** at 312. The court found that

although Smith had an I.Q. of 81, "he has a certain amount of intelligence," *id.* at 325, and that he was self-motivated to tell the police that he was not the shooter and explain his version of events. Tr. Ct. Op. at 14-15. The court stated that it had observed Smith's demeanor on the video-recorded statement, and noted that Smith voluntarily made an additional statement of remorse at the end of the recording. Tr. Ct. Op. at 14; N.T., 4/18/17, at 326. The record supports the court's factual findings, and the totality of circumstances indicates that Smith made a knowing, intelligent, and voluntary waiver of his *Miranda* rights.

We are unpersuaded by Smith's third contention, that his cognitive impairment and his stated motivation for confessing evince that his *Miranda* waiver was unintelligent. A defendant's low I.Q. does not necessarily establish that a *Miranda* waiver was made unintelligently. *Commonwealth v. Hughes*, 555 A.2d 1264, 1275 (Pa. 1989); *see also Commonwealth v. Crosby*, 346 A.2d 768, 772 (Pa. 1975) (collecting cases). We have previously held that a defendant with an I.Q. of 81 was capable of making a valid *Miranda* waiver where he had prior experience with *Miranda* warnings. *See Hughes*, 555 A.2d at 1274-75. Although the defendant in *Williams* scored an 81 on the WASI test, the Supreme Court noted "the test cannot be used diagnostically because it is solely a screening tool." *Williams*, 61 A.3d at 992. The Court's actual holding in *Williams* was to affirm the lower court's determination that the defendant was mentally retarded, such that his sentence of death could not stand. *Id.* The Court did not hold that the

defendant's I.Q. rendered a *Miranda* waiver *per se* unenforceable. **Williams** is thus inapposite.

Smith's further claim that his statement was unintelligent because he was unaware that he could face murder charges is similarly unavailing. The record reflects that Smith knew he was being questioned in relation to the murder and robbery, and the trial court concluded that Smith's ignorance that his involvement in the shooting could subject him to a finding of second-degree murder did not render his *Miranda* waiver unintelligent. N.T., 4/18/17, at 326-27. We agree. There is no requirement that police advise a defendant at the time of administering *Miranda* warnings, **prior** to taking a defendant's statement, as to his level of culpability and what charges might be filed against him. Rather, as we have explained,

> [A]n accused must be aware of the nature of the investigation at the time of the questioning before a waiver of *Miranda* rights can be held to be effective. It does not mean that an accused must be aware of all the consequences which might flow from a waiver of his *Miranda* rights before he can effectively waive them. . . . We also hold that a defendant need not be aware of every conceivable consequence which might flow from a waiver of his *Miranda* rights in order to effectuate such a waiver as it is impossible to foresee every such possible consequence. We merely hold that the defendant must be informed that his statements can and will be used against him in a court of law as required in *Miranda*.

*Commonwealth v. Gotto*, 452 A.2d 803, 807 (Pa.Super. 1982) (quoting *Commonwealth v. Reaves*, 421 A.2d 351, 354 (Pa.Super. 1980)).

Accordingly, there is no requirement that police administering *Miranda* warnings explain whether the defendant could be liable under the felony

murder rule or whether a juvenile defendant could be tried as an adult. *See Commonwealth v. Weeden*, 322 A.2d 343, 346 (Pa. 1974) (finding defendants knowingly waived *Miranda* although the police did not explain that they could be liable under the felony murder rule); *Reaves*, 421 A.2d at 354 (finding officers' *Miranda* warning that defendant's statements could be used against him in a juvenile proceeding did not constitute a promise that defendant would be treated as a juvenile, and resulting waiver effective). We affirm the court's order denying Smith's motion to suppress.

## II. Sentence

In his second issue, Smith argues that the 30-year mandatory minimum sentence imposed by the court pursuant to 18 Pa.C.S.A § 1102.1(c)(1) violates the Eighth Amendment to the United States Constitution. Smith contends that the statute is unconstitutional for three interrelated reasons. First, the imposition of the mandatory 30-year sentence "presents a mismatch between the culpability of a class of offenders (children) and the severity of penalty." Smith's Br. at 43. Second, he argues it "precludes consideration of the general and specific mitigating qualities of youth, making them irrelevant . . . and thus poses too great a risk for disproportionate punishment." *Id.* Third, he maintains that because of the "significantly reduced life expectancy in prison, [the mandatory minimum sentence] unduly circumscribes the rehabilitative idea enshrined in *Graham v. Florida*, 560 U.S. 48 (2010) and *Miller v. Alabama*, 567 U.S. 460 (2012)." *Id.*

Smith acknowledges, as he must, that in ***Commonwealth v. Lawrence***, 99 A.3d 116, 121 (Pa.Super. 2014), we held the 35-year mandatory minimum sentence imposed upon juveniles who commit first-degree murder did not violate the Eighth Amendment. ***See*** 18 Pa.C.S.A. § 1102.1(a)(1). However, he argues we should not extend this holding to the 30-year mandatory minimum sentence for juveniles who commit second-degree murder, because the degree of culpability significantly varies between those who commit first- and second-degree murder. Specifically, Smith claims his 30-year mandatory sentence is disproportionate to his crime as he never possessed the murder weapon, he had no specific intent to kill, he did not agree to a plan that explicitly involved killing, and he even attempted to prevent Hamilton from firing.

Although Smith did not raise this issue in the court below, he may do so now, as it is a challenge to the legality of his sentence, and thus unwaivable. ***See Lawrence***, 99 A.3d at 123-24. We review the legality of a sentence *de novo* standard. ***Commonwealth v. Foust***, 180 A.3d 416, 422 (Pa.Super. 2018). Our scope of review is plenary. ***Id.***

"[D]uly enacted legislation carries with it a strong presumption of constitutionality." ***Lawrence***, 99 A.3d at 118. We will not find a statute violative of the Eight Amendment's prohibition on cruel and unusual punishment unless it calls for a sentence "so greatly disproportionate to an offense as to offend evolving standards of decency or a balanced sense of

justice." **Knox**, 50 A.3d at 741 (quoting **Commonwealth v. Ehrsam**, 512 A.2d 1199, 1210 (Pa.Super. 1986)).

In **Miller**, the United States Supreme Court held that the imposition of a mandatory minimum sentence of life imprisonment upon a juvenile defendant violated the Eighth Amendment. **Commonwealth v. Brooker**, 103 A.3d 325, 334 (Pa.Super. 2014). In response, the Pennsylvania General Assembly enacted a new sentencing statute, 18 Pa.C.S.A. § 1102.1. **Commonwealth v. Batts**, 163 A.3d 410, 419 (Pa. 2017). The statute outlines the penalties for juvenile defendants convicted of first- and second-degree murder. 18 Pa.C.S.A. § 1102.1. It distinguishes between defendants convicted of first-degree murder and second-degree murder, and differentiates those who were younger than 15 years old at the time of the offense from those who were 15 years old and older. **Id.** The subsection under which the court sentenced Smith, subsection (c)(1), applies to juvenile defendants, like Smith, convicted of second-degree murder who were at least 15 years old at the time of the murder, and requires a minimum sentence of 30 years, with a maximum sentence of life imprisonment. **Id.** at (c)(1).

As Smith points out, we previously considered the constitutionality of the subsection that mandates a sentence of 35 years to life for juveniles convicted of first-degree murder, subsection (a)(1). **See Lawrence**, 99 A.3d at 121. Like the subsection under which Smith was sentenced, it applies to juveniles who committed their crime when they were at least 15 years old. 18 Pa.C.S.A. § 1102.1(a)(1). In **Lawrence**, the defendant argued, based on the

U.S. Supreme Court's holding in **Miller**, that subsection (a)(1) was unconstitutional under the Eighth Amendment because it precludes consideration of a defendant's age, his role in the crime, or other factors in determining the juvenile's minimum sentence. **See Lawrence**, 99 A.3d at 121. We declined to extend **Miller** to subsection (a)(1) because, unlike the statute at issue in **Miller**, it does not require a flat sentence of life imprisonment. **Id.** We also specifically rejected the argument that the Eighth Amendment prohibits all mandatory minimum sentences for juveniles as beyond the rule of **Miller**. We pointed out that mandatory minimum sentences, whether measured in days or years, by their nature preclude consideration of a defendant's individual circumstances. **Id.**

Similarly, in **Brooker**, we rejected a claim that the mandatory minimum 35-year sentence that subsection (a)(1) requires is essentially a life sentence. We concluded that such a sentence "still provides a 'meaningful' opportunity for release." 103 A.3d at 339. We also disagreed that the sentence violated **Miller** because it is not sufficiently tailored to a juvenile's individual level of culpability. **Id.**

Given the foregoing, we reject Smith's claims that imposition of a mandatory minimum sentence under Section 1102.1(c)(1) is unconstitutional because such a sentence precludes consideration of the offender's youth, rehabilitative needs, or level of culpability. **See Brooker**, 103 A.3d at 338-40; **Lawrence**, 99 A.3d at 121. We also reject Smith's argument that due to diminished life expectancy in prison, a 30-year sentence imposed on a juvenile

equates to a sentence of life imprisonment. *See Brooker*, 103 A.3d at 338-40.

We additionally decline Smith's invitation to invalidate his sentence because he was convicted under the felony-murder rule. In *Commonwealth v. Olds*, 192 A.3d 1188 (Pa.Super.) *appeal denied*, 199 A.3d 334 (Pa. 2018), we held that the imposition of a mandatory maximum sentence of life imprisonment on a juvenile convicted of second-degree murder is not cruel and unusual, provided there is an opportunity for parole. *Id.* at 1191. Although the defendant in *Olds* was convicted prior to the enactment of Section 1102.1, and was therefore not sentenced under that statute, and although Smith does not challenge his mandatory maximum sentence of life imprisonment, we find the discussion in *Olds* instructive.

In *Olds*, the defendant was found guilty of second-degree murder under the felony-murder rule. *Id.* at 1192 n.12. On appeal, he argued that the intent to kill should not be inferred for juveniles convicted under the felony-murder rule, as "they have diminished capacity to appreciate outcomes," and that a maximum sentence of life imprisonment is cruel and unusual when imposed mandatorily on juveniles who had not killed or intended to kill. *Id.* at 1192, 1192 n.12. We rejected these arguments, and noted that the Eighth Amendment allows for imposition of a mandatory maximum sentence of life

imprisonment, even upon juveniles convicted of non-homicide offenses. *Id.*
at 1196. Relevant to the felony-murder rule, we stated the following:

> In the future, our nation's standards of decency may evolve to the
> point where sentencing a juvenile convicted of second-degree
> murder under an accomplice or co-conspirator theory of liability is
> considered disproportionate and, therefore, cruel and unusual
> punishment. Appellant does not cite a single appellate case, and
> we are unaware of any, which have extended the Eighth
> Amendment this far. . . .
>
> Our society deems the taking of a life, either directly or as an
> accomplice or co-conspirator, sufficiently grievous as to require
> that the defendant not be entitled to release without first going
> through the parole process. Accordingly, we hold that the Eighth
> Amendment permits imposition of [a] mandatory maximum term
> of life imprisonment for juveniles convicted of second-degree
> murder, who did not kill or intend to kill.

*Id.* at 1197–98 (footnotes and citations omitted).

Here, despite Smith's protestations regarding his level of intent, he
admitted that he prowled the streets for 20 minutes, intending to help his
companions commit an armed robbery, and that he decided to rob Stuhlman,
who was out walking his dog, because "even the dog looked weak and small."
Statement, 3/18/15, at 2. Considering that our precedent has established the
Eighth Amendment permits the imposition of mandatory minimum sentences
under Section 1102.1 – sentences that necessarily preclude a consideration of
an individual's level of culpability – and because Smith was appropriately
convicted of second-degree murder under the facts of this case, we do not

find that the imposition of the 30-year mandatory minimum sentence was cruel and unusual.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 5/14/19