J-S09016-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DESMOND SMITH, | : | |
| | : | |
| Appellant | : | No. 1556 EDA 2025 |

Appeal from the Judgment of Sentence Entered May 12, 2025
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0010615-2016

BEFORE: MURRAY, J., LANE, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY LANE, J.:                              **FILED MAY 5, 2026**

Desmond Smith ("Smith") appeals from the judgment of sentence, reimposed by the trial court following this Court's remand for a new suppression hearing, arising from his jury convictions of rape, involuntary deviate sexual intercourse ("IDSI"), and sexual assault.[1] After careful review, we affirm.

The underlying charges arose from sexual offenses against the victim, E.M., on August 22, 2015. In a separate docket, the Commonwealth contended that, approximately five weeks later, Smith participated in the killing of E.M.'s father. A previous *en banc* panel of this Court summarized the underlying factual and procedural history of this case as follows:

---

[*] Former Justice specially assigned to the Superior Court.

[1] *See* 18 Pa.C.S.A. §§ 3121(a)(1), 3123(a)(1), 3124.1.

On September 27, 2015, Kevin Brown [("Brown")], the father of complainant [E.M.,] was killed by masked men who came to his house in Montgomery County. [E.M.], who was a witness to the events, gave a statement to detectives on September 28, 2015. [S]he identified Smith as one of the masked men who came to her family's home and was involved in the killing of her father. She also provided information about the August 22, 2015, sexual assault which was the subject of the charges in the instant trial.

On October 2, 2015, at 6:49 a.m., Montgomery County [H]omicide [D]etective George Henry [("Detective Henry")] arrested Smith at his home in Philadelphia, pursuant to an arrest warrant. The arrest arose from the September 27, 2015 homicide. Smith . . . was taken to the Montgomery County Detective Bureau where he was intermittently interviewed by Detective Henry over the course of about 11 hours, starting with waiver of his **Miranda**[2] rights at 8:42 a.m. and concluding around 7:51 p.m.

During the course of questioning, Smith was asked about the murder o[n] September 27, 2015, and about the August 22, 2015, sexual assault of [E.M.] Smith initially denied involvement in either the murder or the sexual assault. By the end of the questioning, he confessed to both the murder and the sexual assault.

**Commonwealth v. Smith**, 277 A.3d 595, 597-98 (Pa. Super. 2022) (*en banc*).[3]

The Commonwealth charged Smith in Montgomery County with the homicide of Brown. Separately, the Commonwealth charged Smith, in the instant matter, in Philadelphia with the sexual assault against E.M. We first briefly review the homicide trial:

---

[2] **See Miranda v. Arizona**, 384 U.S. 436 (1966).

[3] For ease of review, when quoting the *en banc* panel memorandum, we have changed its references to "Appellant" to "Smith."

In [July 2016], Smith and [his] co-defendant[,] Naadir Abdul-Ali [("Abdul-Ali"),] were tried [together before a jury]. Smith presented an alibi defense, including phone[-]tracking data and video evidence, and was acquitted. Abdul-Ali was convicted.

On the day of the verdicts in the homicide case, [E.M.] posted on Facebook criticizing the alibi testimony and the acquittal, expressing her anger[,] and insisting that Smith was the person who killed her father and that he was wrongfully acquitted.

*Id*. at 598 (paragraph break inserted).

Meanwhile in the underlying sexual assault case, both parties filed pre-trial evidentiary motions, as follows.

[Smith] filed a motion to suppress his admissions to police regarding his sexual acts with E.M. Specifically, Smith averred that the *Miranda* warnings, provided at the start of his interrogation, did not establish that he voluntarily waived his right to counsel and to remain silent regarding E.M.'s sexual-assault allegations. He reasoned that the *Miranda* warnings, given in the morning, were too far removed from his inculpatory statements provided in the evening. Smith also averred that the warnings were insufficient because they only informed him of his rights in connection to the homicide charges but made no mention of E.M.'s sex-offense allegations. On December 20, 2017, a suppression hearing was conducted, at the close of which the court denied Smith's motion to suppress his statements to police.

Also prior to trial, the Commonwealth filed a motion to preclude Smith from admitting evidence that his inculpatory statements to police were coerced and false. Specifically, Smith wished to admit alibi evidence presented at his homicide trial — namely, surveillance video from SEPTA, and cell phone location data — to show that his confession to being at the scene of the murder was false. Smith reasoned that the homicide alibi evidence would show "that if the homicide portion of the confession was patently unreliable, then the portions relating to the sexual assault [were] likewise questionable[,] since they were taken on the same day, during the same interrogation, by the same detectives." The trial court ultimately granted the Commonwealth's motion to preclude this evidence.

In a third, pre-trial evidentiary ruling, the court denied Smith's request to be permitted "to present evidence, in the form of social media posts, that E.M. had a motive or bias to fabricate allegations against Smith — or question E.M. regarding the same — at the trial in the matter sub judice." The trial court denied Smith's motion to admit this evidence.

*Smith*, 277 A.3d at 598-99 (citations omitted).

This matter proceeded to a jury trial in December 2018.

[T]he Commonwealth presented evidence that Abdul-Ali and [E.M.] were in a romantic relationship starting in the summer of 2015. [E.M.] met Smith through Abdul-Ali, and was in his company three or four times. On August 22, 2015, Abdul-Ali became angry with [E.M]. While she was in the car with him[,] he became verbally and physically abusive.

They drove to a CVS parking lot, where Abdul-Ali continued to physically abuse and threaten [E.M.], including putting a gun to the back of her head and threatening to kill her. Abdul-Ali then ordered [E.M.] to perform oral sex on him in the car, during which he made a video call to Smith and displayed [E.M.] performing oral sex.

Abdul-Ali then drove [E.M.] to Smith's house to force her to have sex with Smith, despite her pleading and refusals. Once they arrived, he took her into Smith's bedroom. Abdul-Ali ordered [E.M.] to disrobe and perform oral sex on him and Smith, then to have vaginal and anal intercourse with Smith, during which she was forced to have vaginal intercourse with Abdul-Ali. During the course of the incident[,] Abdul-Ali threatened [E.M.] with a gun and threatened or subjected her to physical force, including forcing the gun into her mouth.

Smith gave a statement in which he admitted to having oral, attempted anal[,] and vaginal intercourse with [E.M.], asserting that she had been "acting like a victim[."]

*Id*. at 598 (citation omitted).

The jury found Smith guilty of rape, IDSI, and sexual assault.

On March 1, 2019, the court sentenced [Smith] to two, consecutive terms of 10 to 20 years' incarceration for rape and IDSI. His offense of sexual assault merged for sentencing purposes. Thus, Smith's aggregate sentence is 20 to 40 years' incarceration. Smith filed a timely post-sentence motion, which the court denied. He thereafter filed a timely notice of appeal . . . .

*Smith*, 277 A.3d at 599.

On June 6, 2022, an *en banc* panel of this Court vacated Smith's judgment of sentence, concluding that the suppression court had not complied with Pennsylvania Rule of Criminal Procedure 581(I) by not placing findings of fact and conclusions of law on the record.[4] This Court thus remanded for a new suppression hearing, directing the trial court to "issue specific findings of fact and conclusions of law." *Id*. at 606. The panel further explained that if the trial court denied Smith's motion to suppress, no new trial would be necessary, and the court may reimpose his judgment of sentence. The panel declined to address Smith's challenge to the discretionary aspects of his sentence. The panel advised that Smith may then file an appeal raising any challenges to the suppression court's ruling and/or to the discretionary aspects of his sentence.

_____

[4] We note that the Honorable Robert Gordon presided over the suppression hearing, issued its rulings, but did not set forth its reasoning on the record or in an opinion. The Honorable Giovanni Campbell presided over trial and issued the Pa.R.A.P. 1925(a) opinion, which similarly did not set forth the suppression court's findings of fact.

- 5 -

On May 12, 2025, the trial court conducted a new suppression hearing. The Commonwealth presented testimony from Detective Henry regarding, *inter alia*, Smith's **Miranda** waiver and statement. Smith did not present any evidence. Smith argued that the trial court should suppress his statements regarding the alleged sexual assault because police obtained them in violation of his constitutional rights. Specifically, Smith contended that although he initially waived his **Miranda** rights during questioning about a homicide, that waiver did not extend to later interrogation concerning an unrelated sexual assault. Smith asserted that police failed to re-administer **Miranda** warnings when the focus of questioning shifted, rendering his subsequent statements unknowing and involuntary. He further maintained that the prolonged custodial interrogation, undocumented off-the-record discussions, deceptive references to purported DNA evidence, and the lapse of time between questioning constituted coercive circumstances under the totality of the circumstances.

The Commonwealth responded that the trial court should deny Smith's motion to suppress because he knowingly, intelligently, and voluntarily made his statements following a valid **Miranda** waiver. The Commonwealth argued that the detective's interrogation constituted a continuous custodial interview and, therefore, did not require renewed **Miranda** warnings despite breaks in questioning or a shift in subject matter. The Commonwealth asserted that detectives advised Smith of his rights shortly after he arrived at the

Montgomery County Detective Bureau, that he remained cooperative throughout the interview, and that officers provided him with food, restroom, and cigarette breaks. The Commonwealth further contended that there was no evidence of coercion, threats, or mistreatment, and that any references to DNA evidence were related to the homicide investigation and did not render Smith's statements involuntary. The Commonwealth asserted that detectives questioned Smith about the sexual assault incident to corroborate E.M.'s identification in the homicide investigation. Finally, according to the Commonwealth, *Miranda* did not require police to inform a suspect of every potential offense under investigation.

Thereafter, the trial court summarized the Commonwealth's evidence and made the following findings of fact on the record:

> We heard testimony pursuant to a motion to suppress Smith's statement pursuant to which retired Detective [] Henry testified that on October 2, 2015, he had been a detective of approximately one year with prior experience as a . . . Lower Merion Township police officer . . .. He indicated that on that date, he had been assigned to investigate the death of Brown pursuant to which an arrest warrant for Smith had been issued. [Detective Henry] was present for the execution of that warrant.
>
> [Detective Henry] indicated that they entered before 7 a.m. and shortly after the entry, he had brief interactions with Smith, after which he executed [Exhibit C-1, a consent to search his residence. Smith also executed Exhibit C-2,] a . . . waiver permitting him to be transported to Montgomery County for questioning. [Detective Henry] testified that Smith was cooperative, as he was at all times, and he was permitted to get dressed. He was taken back to Montgomery County by vehicle that was driven by the detective and that Smith was shackled in that vehicle.

Due to a lot of traffic, they arrived at around 8:25 a.m. or 8:30 a.m. Smith was transported to the office on the fifth floor where he was no longer handcuffed, but his legs were shackled in the office. At 8:42 a.m. he was given his **Miranda** warnings. At that time Detective [Paul] Bradbury was present as he was at some other times.

Offered by the Commonwealth was Exhibit [C-]3, which were the **Miranda** warnings signed by Smith at 8:42 a.m. The form indicates that a homicide was being investigated — this was a standard form — and indicated that Smith's demeanor was . . . polite and cordial throughout the statement, which was taken in several parts.

It began with nonconfrontational questions dealing mostly with biographical information. [Detective Henry] indicated the statement was typed as given and he was making corrections on the computer before printing out. [Detective Henry] indicated that he was satisfied that Smith's waiver of **Miranda** rights was voluntary. He indicated that the only time Smith was given his warnings was that one time at 8:42 a.m.

[The DNA sample that Smith had given consent for was memorialized in [Exhibit] C-5 for a buccal swab, which has been signed at 9:15 a.m. . . . ]

[Smith's] actual statement[, Exhibit C-4,] is logged to have started at 9:27 a.m. And in it Smith confirms that he received the waiver of **Miranda** form and that he executed it regarding the investigation of the murder of Brown. The detective indicated that at this point he did not advise Smith of any sexual allegations because there were none he knew of at that particular time.

At some point [during the interview Detective Henry] did become aware of a summary submitted by E.M. indicating [the sexual assault allegations], but his focus was on the homicide. [Smith] was asked about the shooting incident . . . which resulted in the homicide of Brown . . . .

On pages 3 and 4 [Detective Henry] asked questions about the . . . codefendant, Abdul-Ali . . . . Somewhere around this time, if not earlier, Smith had consented to a DNA sample. The detective asked questions regarding [Abdul-Ali] and his girlfriend

because he was aware that . . . she was the daughter of the decedent.

On page 5, Smith provided an August timeframe and denied any sex with E.M. even though the detective had not asked about it. Around that time . . . was the first bathroom break at 10:56 a.m. The end of that portion of the statement is confirmed with a notation that it is, quote/unquote, ended.

\* \* \* \*

[The s]tatement resumed at 2:56 p.m. and the words used by the detective was statement reopened, quote/unquote. [Detective Henry testified that d]uring the four-hour break before that, . . . he discussed with Smith [sports and family], and probably about the case, specifically that [Smith] had been identified by E.M. as being at the scene of the murder.

[Detective Henry a]lso testified that Smith was given coffee and a bagel, the latter of which he refused, and pizza and soda and given other breaks, including bathroom breaks, and at least one smoking break. In that discussion during the break, . . . the alleged possession of a gun [also] came up in the context of both the homicide investigation and the alleged sexual assault.

[Detective Henry] indicated that at 3:05 p.m., Lieutenant [Richard] Neilson [("Lieutenant Neilson")] entered the room in a white lab coat and indicated that they had a positive DNA result for the rear door of the scene of the murder, which Smith asked about, but Lieutenant Neilson did not address it in response other than to repeat this allegation.

[Detective Henry] also testified that shortly before this, Smith was preoccupied with the test results and seemed nervous and that [the detective's] partner had been on the phone pretending to get the lab to speed up with the results.

[Exhibit] C-6 is a report of the detective's activities[, which stated] that during the four-hour [break, noted above,] Smith had been given two additional bathroom breaks at 12:35 and 2:30 p.m. as well as food at 2:35 p.m.

When the narrative or statement resumed on page 7, Smith identified [Abdul-Ali's] car and they broke again at 3:35. There

[was a] bathroom break[] at 4:17 and . . . a cigarette break [at 5:20]. During cross-examination the detective admitted that Smith was in custody approximately 14 hours and the statement, with breaks, took approximately 11 hours.

At some point around this time, Detective Henry told Smith that [Abdul-Ali] was a real bad guy and that Smith had probably just got sucked into something and the statement resumed at 5:39 p.m. Smith had also been told that E.M. had [identified] him at the scene of the murder. At this point Smith made no mention of using force on E.M. as he was asked about his interactions with [Abdul-Ali] and the firearm.

[Smith's] statement continues on page 9 when [Smith] admitted [to] having been in the car with [Abdul-Ali on the day of the homicide] and the two other males that were charged in the homicide . . .. Still at that time there was no indication by Smith he used force in his sex with E.M. During this time Smith [identified] the vehicle that he was a passenger in and driven by Abdul-Ali.

On page 10 [Smith] described the other males in the car as [B]lack . . . and one of them he identified as D. He indicated that he rode with them to [Brown's] house. They went inside and he either remained in the car or went back to the car. Denies seeing masks. He indicated that he heard shots.

Then the statement was paused again for another break at some undisclosed time after which the detective asked Smith if they could video the statement in order to memorialize a summary of it, which Smith refused. He signed [Exhibit] C-6 at 7:51 p.m., a nonconsent to video statement.

So the statement resumes. The word used was reopened at 8:16 p.m. The detective testified that Smith's demeanor remained polite, although at this point they were tired, but he was alert. This is around the time where, on page 13, [Smith] identified D as one of the people in the car with him and this person was wearing black. And he confirmed again he had been treated well as he had in other sections of the statement during the interview.

At many different points, Detective Henry testified that he had asked about [E.M.] because she had described Smith as

- 10 -

having been at the house when [Brown] was killed. At that point that was the focus on the investigation.

N.T., 5/12/25, at 95-101.[5]

The trial court determined Detective Henry's testimony was "credible in all respects." N.T., 5/12/25, at 102. The trial court concluded that: (1) Smith underwent "a singular, [albeit] protracted interrogation with adequate breaks;" (2) Smith "was, at all times, fully aware of his rights;" (3) the homicide was "admittedly, historically, and contextually related to the rape allegations;" (4) "the **Miranda** warnings were not too remote;" (5) nothing that occurred "render[ed Smith's] statement involuntary;" and (6) "there is simply no evidence in this record that Smith was, in any way, threatened, mistreated or coerced." **Id**. at 102-04. Accordingly, the trial court denied Smith's motion to suppress. The trial court immediately conducted a resentencing hearing and imposed the same aggregate sentence of twenty to forty years' incarceration.

Smith did not file a post-sentence motion.[6] Smith timely filed the instant notice of appeal. **See Smith**, 277 A.3d at 606.

_____

[5] For ease of review, when quoting the suppression hearing transcript, we have changed its references to "defendant" to "Smith," "Kevin Brown" to "Brown," and removed references to "Mr." The transcript incorrectly identified E.M., the victim of the sexual assault, as "Ms. Abdullah." Accordingly, we have also substituted "E.M." for "Ms. Abdullah."

[6] Although the en banc panel stated that Smith "may file an appeal raising any challenges . . . to the discretionary-aspects-of-sentencing claim(s)[,]" that
*(Footnote Continued Next Page)*

The trial court did not order the filing of a Rule 1925(b) concise statement but issued a letter in lieu of a Rule 1925(a) opinion, referring this Court to the transcript of the May 12, 2025 suppression hearing.

Smith raises the following two issues for our review:

[1.] Did the trial court err and/or abuse its discretion when it denied [Smith's] pre-trial motion to suppress a statement made to police investigators where: [Smith] waived his *Miranda* rights and provided a statement when police informed him that he was being charged with homicide; and [Smith] was not re-advised of his *Miranda* rights, and did not waive those rights knowingly, intelligently, and voluntarily, when several hours later police began to question [Smith] about a separate sexual assault occurring on a different date than the homicide in a different jurisdiction?

[2.] Is the sentence imposed unduly harsh and excessive?

Smith's Brief at 6.

In Smith's first issue, he argues that the trial court erred in denying his motion to suppress the inculpatory statements he made to police, concerning the rape and sexual assault of E.M. Our standard of review in addressing a challenge to the denial of a motion to suppress is

> limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of

_____

language does not obviate the preservation requirements of Pa.R.Crim.P. 720. *See Commonwealth v. Luketic*, 162 A.3d 1149, 1160 (Pa. Super. 2017) (stating that "[i]ssues challenging the discretionary aspects of a sentence must be raised in a post-sentence motion or by presenting the claim to the trial court during the sentencing proceedings"). Accordingly, "[a]bsent such efforts, an objection to a discretionary aspect of a sentence is waived." *Id*.

the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to plenary review.

*Smith*, 277 A.3d at 602 (citation omitted).

Both the United States and Pennsylvania Constitutions protect individuals from compelled self-incrimination. *See* U.S. Const. amend. V; *see also* Pa. Const. Art. I, § 9. Before a person is subjected to custodial interrogation, "the officers must first warn [him] that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed." *Commonwealth v. Yandamuri*, 159 A.3d 503, 520 (Pa. 2017). A suspect may waive these rights, but "the Commonwealth bears the burden to prove by a preponderance of the evidence that the defendant's *Miranda* waiver was knowing, intelligent, and voluntary." *Commonwealth v. Smith*, 210 A.3d 1050, 1058 (Pa. Super. 2019). The voluntariness of a confession is determined by examining the totality of the circumstances surrounding its procurement. *See id*. Factors relevant to this inquiry include: "(1) the duration and means of an interrogation; (2) the defendant's physical and psychological state; (3) the conditions attendant to

- 13 -

the detention; (4) the attitude of the interrogator; and (5) any and all other factors that could drain a person's ability to withstand suggestion and coercion." *Id*. (citation and quotation marks omitted).

> The question of voluntariness is not whether the defendant would have confessed without interrogation, but whether the interrogation was so manipulative or coercive that it deprived the defendant of his ability to make a free and unconstrained decision to confess.

*Smith*, 277 A.3d at 602 (citation omitted).

This Court has stated: "[V]oluntary statements by an accused, given more than six hours after arrest when the accused has not been arraigned, are no longer inadmissible *per se*. Rather, regardless of the time of their making, courts must consider the totality of the circumstances surrounding the confession." *Commonwealth v. Garland*, 63 A.3d 339, 343 (Pa. Super. 2013) (citation omitted). "[T]he appellate courts have expressly rejected the position that the length of time is determinative." *Id*.

> Moreover,
>
> we have never held[] that a suspect must be informed of each and every crime under investigation. On the contrary, we have consistently held that the Commonwealth, in meeting its burden of proving a waiver was knowing and intelligent, may establish the circumstances attending the interrogation and the lack of ambiguity as to the questioning's direction and purpose.

*Commonwealth v. Green*, 683 A.2d 659, 664 (Pa. Super. 1996) (citation omitted); *see also Commonwealth v. Travaglia*, 467 A.2d 288, 293 (Pa. 1983) (stating that although *Miranda* does not require that police provide a suspect with information as to the crime under investigation, this Court has

- 14 -

held "a suspect must have 'an awareness of the general nature of the transaction giving rise to the investigation,' in order to make an intelligent and understanding waiver of his rights").

Our Supreme Court has explained:

There is no prophylactic rule that a suspect must be re[-]warned of his constitutional rights each time custodial interrogation is [renewed]. Instead, we must view the totality of circumstances in each case to determine whether such repeated warnings are necessary.

Pertinent to such an inquiry are the length of time between the warnings and the challenged interrogation, whether the interrogation was conducted at the same place where the warnings were given, whether the officer who gave the warnings also conducted the questioning, and whether statements obtained are materially different from other statements that may have been made at the time of the warnings.

*Smith*, 277 A.3d at 604 (citations omitted); *see also Colorado v. Spring*, 479 U.S. 564, 576–77 (1987) (holding that a suspect's awareness of all potential subjects of interrogation is not necessary to establish a knowing and intelligent waiver of *Miranda* rights).

Smith argues that his initial *Miranda* waiver — given during questioning about a homicide — did not extend to later interrogation about an unrelated sexual assault. Thus, Smith maintains that he gave his subsequent statements unknowingly and involuntarily, rendering them inadmissible. Smith contends that police should have but failed to re-administer *Miranda* warnings when the focus of questioning shifted to another crime. Smith further asserts that under the totality of the circumstances, the prolonged

- 15 -

custodial interrogation, significant breaks in questioning, undocumented off-the-record discussions, deceptive references to purported DNA evidence, and the lapse of time between interrogation sessions collectively undermined the validity of his waiver. Accordingly, Smith maintains that the suppression court erred in denying his motion.

Following remand, the trial court set forth detailed findings of fact and conclusions of law, stating:

> This court finds Detective Henry's testimony to be credible in all respects. This court finds or concludes that Smith was subject to custodial interrogation at the police [station,] triggering his right to **Miranda** warnings at that time. This court also concludes that Smith did receive **Miranda** warnings before giving the statement after he voluntarily waived his right to remain silent.
>
> This court finds under the totality of the circumstances that [Smith's three written statements, taken at 9:27 a.m., 2:56 p.m. and 5:39 p.m., over the course of his interrogation,] reflect a singular, if protracted, interrogation with adequate breaks to adjust for changes in circumstances and for Smith's comfort. Use of the word ended does not control in this analysis. Rather, the content or chronology and particular circumstances make it clear that this was one narrative with appropriate breaks.
>
> This court further concludes that Smith was, at all times, fully aware of his rights and in full agreement to waive his rights and did not need those rights to be repeated after each interval. This court finds no legal authority for the proposition that the detective must have prophylactically renewed warnings every time that he resumed questioning Smith. . . .
>
> This court concludes that information regarding other crimes may arise during the interrogation for murder does not create a duty of the Commonwealth to renew **Miranda** warnings to any additional incidents disclosed. This conclusion should render moot any argument about affect of Smith becoming a rape suspect during the course of the interrogation for a homicide, which was

admittedly, historically, and contextually related to the rape allegations that were later founded and Smith was tried and convicted for.

As to the length of the interrogation that the defense also argued about, this court concludes that the ***Miranda*** warnings were not too remote from Smith's disclosure of the rape conduct to render his statement involuntary. Specifically, this court concludes that his status in custody for 14 hours and interrogation with long breaks for 11 hours does not render his statement involuntary absent any evidence of coercion or other unlawful influence. Smith's statement was knowing and voluntary. That includes the misinformation to Smith that his DNA was found during the investigation.

* * * *

N.T., 5/12/25, at 102-04 (unnecessary capitalization omitted).

Upon review, we conclude that the trial court did not err in denying Smith's motion to suppress, as the record supports its factual findings and its legal conclusions are free from error. ***See Smith***, 277 A.3d at 602. Here, the uncontroverted evidence established that Detective Henry advised Smith of his ***Miranda*** rights at approximately 8:42 a.m. and that Smith executed a written waiver prior to questioning. Smith remained cooperative and alert throughout the interview, which constituted a continuous custodial interrogation punctuated by periodic breaks for food, cigarettes, and restroom use. Smith never invoked his right to remain silent or requested counsel. Under the totality of the circumstances, the Commonwealth met its burden of proving a knowing, intelligent, and voluntary waiver. ***See Smith***, 210 A.3d at 1058.

Contrary to Smith's assertion, detectives were not required to re-administer **Miranda** warnings when questioning shifted to the sexual assault allegations. Pennsylvania courts have consistently held that police need not inform a suspect of every potential offense under investigation, provided he understands the general nature of the inquiry. **See Green**, 683 A.2d at 664; **see also Travaglia**, 467 A.2d at 293. Likewise, the United States Supreme Court has determined that a suspect's awareness of all possible subjects of interrogation is not necessary for a valid waiver. **See Spring**, 479 U.S. at 576–77. Moreover, the record reflects that the homicide and sexual assault allegations involved: (1) the same complainant; (2) the same residence where she lived and where Brown was murdered; (3) circumstances relevant to E.M.'s identification of Smith; (4) facts establishing that E.M. was dating the co-defendant and had met Smith approximately four times before; (5) that the sexual assault occurred five weeks prior to the homicide; and (6) that E.M. identified Smith as one of the men present in her home during Brown's murder. Accordingly, the detectives' lack of re-administering **Miranda** warnings did not render Smith's waiver invalid.

Additionally, the passage of time and the breaks in questioning did not render Smith's waiver ineffective. There is no prophylactic rule requiring renewed **Miranda** warnings each time the police resume an interrogation; rather, courts assess the totality of the circumstances. **See Smith**, 277 A.3d at 604. Here, as the trial court specifically found, the interrogation occurred

at the same location, involved the same investigators, and remained part of a single, ongoing investigative process.

Furthermore, the record supports the trial court's determination that Smith's statements were voluntary. Smith's written statement acknowledged that the Detectives treated him courteously, provided breaks, and did not subject him to threats or mistreatment. At the suppression hearing, Smith did not challenge these representations. Although detectives employed investigative tactics, including one detective's representation, while wearing a lab coat, that DNA evidence linked Smith to the crime scene — such conduct did not rise to the level of coercion sufficient to overbear Smith's will. *See Garland*, 63 A.3d at 343.

Considering the totality of the circumstances, we conclude that Smith's *Miranda* waiver remained valid throughout the interrogation and that he made knowing, intelligent, and voluntary statements. Accordingly, the trial court properly denied Smith's motion to suppress, and his first issue merits no relief.

In Smith's second issue, he challenges the discretionary aspects of his sentence reimposed following the new suppression ruling. However,

> [t]his Court does not review such issues as a matter of right. An appellant must satisfy a four-part test to invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence. The appellant must satisfy all of the following:
>
> > (1) the appellant preserved the issue either by raising it at the time of sentencing or in a post[-]sentence motion; (2) the appellant filed a timely notice of

- 19 -

appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of his appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raises a substantial question for our review. . . .

[This] Court has found that where the issues raised assail the trial court's exercise of discretion in fashioning the defendant's sentence, the trial court must be given the opportunity to reconsider the imposition of the sentence either through the defendant raising the issue at sentencing or in a post-sentence motion. The failure to do so results in waiver of those claims.

*Commonwealth v. Tejada*, 107 A.3d 788, 797-98 (Pa. Super. 2015) (citations omitted).

Here, Smith did not preserve this issue at resentencing or in a post-sentence motion. *See Tejada*, 107 A.3d at 797-98. Thus, Smith has waived this claim for our review.

Even if not waived, however, Smith has failed to raise a substantial question.

The determination of what constitutes a substantial question must be evaluated on a case-by-case basis. We have found that a substantial question exists when the appellant advances a colorable argument that the sentencing judge's actions were either: (1) inconsistent with a specific provision of the Sentencing Code; or (2) contrary to the fundamental norms which underlie the sentencing process. [W]e cannot look beyond the statement of questions presented and the prefatory [Rule] 2119(f) statement to determine whether a substantial question exists. . . .

We consistently have recognized that excessiveness claims premised on imposition of consecutive sentences do not raise a substantial question for our review. [A] court's exercise of discretion in imposing a sentence concurrently or consecutively does not ordinarily raise a substantial question[. Additionally, t]his court has held on numerous occasions that a claim of inadequate consideration of mitigating factors does not raise a substantial question for our review.

- 20 -

***Commonwealth v. Radecki***, 180 A.3d 441, 468-69 (Pa. Super. 2018) (citations and quotation marks omitted).

Instantly, Smith's Rule 2119(f) statement, though lengthy, asserts that the trial court imposed consecutive, above-guideline sentences while failing to consider mitigating factors. **See** Smith's Brief at 51-52. These assertions amount to a disagreement with the sentencing court's exercise of discretion in weighing the relevant factors and do not raise a substantial question warranting appellate review. **See Radecki**, 180 A.3d at 468-69. Accordingly, as we determine neither of Smith's issues merit relief, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/5/2026